Fowler *et al. v.* Duhme *et al.*

Filed January 9, 1896.

No. 16,713.

## FOWLER ET AL. *v.* DUHME ET AL.

WILL.—*Intention of Testator.*—The intention of the testator will be carried out, in construing a will, so far as it can be done lawfully and consistently.

SAME.—*Devise of Land.—When Vests.*—A devise of land will be deemed to vest at the death of the testator unless an intention to the contrary on the part of the testator clearly appears.

Fowler *et al. v.* Duhme *et al.*

143   248
f171   384

Same.—*Devise in Fee, When Not Cut Down by Subsequent Provisions.* —A devise in fee cannot be cut down by subsequent provisions of the will unless the intention to do so is manifest from words as clear, certain and effective as those which created the fee.

Same.—*Devise.—Suspension of Power of Alienation.*—An unlawful suspension of the power of alienation for a longer period than any number of lives in being is created by a will forbidding absolute devisees of land to alienate the same for twenty-five years after the execution of the will.

Same.—*Devise.—When Vests.—Provisions in Case of Death of a Devisee.*—A devise to the testator's children "and to their respective heirs forever" vests absolutely on the death of the testator, notwithstanding a subsequent provision that, upon the death of any child without lawful issue living at the time of such death, his share shall pass absolutely to such of the children as shall then be living and the descendants of such as are dead, and a provision in a codicil executed after the death of one child, devising the share given her by the will to her only child, subject to the same "limitations and restrictions" under which she would have taken under the will.

Same.—*Devise.—Fee Simple.—Devise Over.—Vesting.*—A devise in terms denoting an intention that the primary devisee shall take a fee on the death of the testator, coupled with a devise over in case of the death without issue of such primary devisee, vests absolutely in the latter upon the death of the testator during his lifetime.

From the White Circuit Court.

*Stuart Bros. & Hammond, Sellers & Uhl* and *Winter & Elam,* for appellants.

*E. W. Kittredge, A. C. Harris, Gould & Eldridge* and *L. A. Cox,* for appellees.

Hackney, C. J.—On the 29th day of July, 1884, Moses Fowler, then sixty-nine years of age, was possessed of considerable wealth, consisting of near 18,000 acres of farm lands in Benton county, 2,000 acres in the counties of Tippecanoe and White, between 900 and 1,000 lots in the town of Fowler, city property in Lafayette, and personal property of more than $850,-000. He and his wife, the appellant Eliza Fowler,

. had become estranged, and were living apart. His then living children were the appellant James M. Fowler, a married man more than forty years of age, and the father of children, Annis E. Chase, a married daughter, whose only child was the appellee, Moses Fowler Chase, then but six years of age, and the appellee, Ophelia M. Fowler, now Duhme, then being twenty-nine years of age, and unmarried.

On that day, said Moses Fowler executed his last will by which he disposed of his entire estate. Thereafter the said Annis E. Chase departed this life, leaving as her only heirs at law, her said son, and the appellee, Frederick S. Chase, her husband. After the death of said Annis E. Chase, the said Moses Fowler executed a codicil to said will, which will and codicil were as follows:

"I, Moses Fowler, of the city of Lafayette, Tippecanoe county, Indiana, being of sound mind and disposing memory, but realizing the uncertainties of life, do make and publish this, my last will and testament, hereby revoking all former wills by me at any time made.

"1.   I direct that all my just debts and funeral expenses be paid by my executors.

"2.   I give, devise and bequeath to my wife, Eliza Fowler, and to her heirs forever, the undivided one-third in value of all the real estate, wheresoever situate, of which I may die seized or possessed.

"I also give and bequeath to my said wife, absolutely and forever, the sum of $5,000.

"I have executed title bonds for the conveyance of certain lots or tracts of land which I have sold at what I deemed a fair consideration. Should my said wife, when such conveyances are required to be made, join therein, and release her interest in all real estate which I may have thus sold, to the several purchasers, then I

direct that she be paid by my executors, in addition to the said $5,000, the full one-third of the consideration or purchase-money received by me, or my representatives, for and on account of the sale of each of said lots or tracts of land, together with interest thereon at six per cent. from the time of its payment.

"3.   I give, devise and bequeath the remaining undivided two-thirds in value of all my real estate, wheresoever situate, to my three children, James M. Fowler, Annis E. Chase and Ophelia M. Fowler, share and share alike, in equal portions, and to their respective heirs forever, subject to the following conditions, to-wit:

"(a).   In the event of the death of any of my said children without lawful issue *living at the time of the death of such child*, then the share of such deceased child shall vest in, and become the absolute property in fee simple, in equal portions, of such of my said children as shall then be living, and the living descendants of such, if any, as may then be dead, the descendants of any deceased child taking, between them, the share which, if living, would have vested in their father or mother.

"(b).   No part of the real estate situate in Benton county, Indiana, and which by this item of my will is devised to my three children, as aforesaid, or any interest therein, shall be sold or alienated by my said children, or any of them, or their heirs, for the period of twenty-five years from and after the date of the execution of this my will.

"I impose this restriction, because, in my judgment, said real estate properly managed and cultivated is the best form of investment my children can have.

"4. I give, devise and bequeath all the residue of my property, personal and mixed, of every kind and description whatsoever, and wheresoever situate, not

hereinbefore disposed of, to my three children, James M. Fowler, Annis E. Chase, and Ophelia M. Fowler, or to such of them as may survive me, and to their respective heirs forever, in equal portions, provided, however, that in case of the decease of any of my said children before me, the share of such deceased child shall go to his or her lawful issue, if any there be, *living at the time* of my decease.

"5. In any division ·or partition of the real estate which may be made among my said children, I direct that the one hundred and twenty acres of land in Tippecanoe county, known as the High Gap farm, be set off as part of the portion of my son, James M. Fowler, if it can be done without prejudice to the others.

"6. I hereby constitute and appoint my friends, Brown Brockenbrough and James M. Reynolds, of Tippecanoe county, Indiana, executors of this my last will and testament.

"In testimony whereof, I have hereunto set my hand and seal, this 29th day of July, 1884.

M. FOWLER.   [SEAL].

"Signed and acknowledged by said Moses Fowler as his last will and testament in our presence, and signed by us at his request in his presence.

CHARLES B. PHELPS,<br>W. DEWITT WALLACE.

"I, Moses Fowler, by way of codicil to my last will and testament above written, hereby give and devise in fee simple, to my grandson, Moses Fowler Chase, the share in my real estate which by my said will was devised to my daughter, Annis E. Chase, now deceased, he taking the same subject to the same limitations and restrictions which my said daughter, Annis E., his mother, would have taken the same under my said will had she sur-

vived me, it being my will that my said grandson shall take the same share in my real estate as well as in my personal property, which his mother would have taken under said will had she been living at my death.

"Furthermore, I revoke the appointment of James M. Reynolds as one of my executors, and in his place I appoint as one of my executors, my son, James M. Fowler, who with Brown Brockenbrough, shall constitute my sole executors.

"Witness my hand this 1st day of June, 1888.

M. FOWLER.

"Signed and acknowledged by said Moses Fowler as a codicil to his last will and testament, in our presence and signed by us at his request, in his presence, and in the presence of each other.

CHARLES B. PHELPS.
W. DEWITT WALLACE."

Moses Fowler died on the 20th day of August, 1889, and said Eliza Fowler, as his widow, James M. Fowler, his son, Ophelia Fowler Duhme, his daughter, then married, and Moses Fowler Chase, his grandson, survived him as his only heirs at law.

The will and codicil were duly probated, and said widow elected to reject the provision made for her by said will, and to take her interest in said estate as provided by law. Following the probating of the will, and said election by the widow, she, said Eliza Fowler, instituted a proceeding to contest and set aside said will, which proceeding was certified to, and became pending in the Circuit Court of the United States for the district of Indiana. At that time various disagreements existed between the devisees, and counsel representing their interests, as to the proper construction of said will, as to the ownership of various valuable prop-

erties, the legal title to which was in James M. Fowler as to parts, and in Frederick S. Chase as to parts, the equitable title in which, it was claimed by some, was in said Moses Fowler; the legal title to parts being in said Moses Fowler, and the equitable title claimed by certain of the devisees; as to numerous gifts and advancements to the testators' children, and other questions threatening the peace, good will and financial interests of the members of the testator's family. With these disagreements pending, suit was instituted for partition. At this point a compromise was effected, by which all of the disputed questions, excepting that as to the construction of the will, were amicably adjusted, said suit to contest the will was dismissed, partition was had, the widow was given the fee in one-third of the real estate, $15,000 of the personalty, and an annuity payable by James M. Fowler, Ophelia Fowler Duhme and Moses Fowler Chase, and the two children and the grandchild were given each the two-ninths, in value of the real estate, and a like proportion of the personal, after deducting and crediting to the various legatees certain sums agreed upon. In this settlement the adults for themselves, and said grandson by his guardian, upon the order of the circuit court having jurisdiction, concurred. There yet remained a question as to the character of title, which, by the provisions of the will, the said James M. Fowler, Ophelia Fowler Duhme, and Moses Fowler Chase, obtained and held in the lands so set off to them in partition, said question arising upon the construction of clause *a,* item three, of the will as above set forth. It was insisted by some that the death, in said clause referred to, was a death during the life of the testator, while by others it was maintained that such death was intended by the testator to mean a death after his

death.   The former proposition was agreed to, as a part of said family settlement, by all of the devisees, excepting said grandson, whose guardian was denied the right, by said circuit court, to join in that part of said settlement.

Thereupon this suit was instituted by Ophelia Fowler Duhme and her husband against James M. Fowler, Eva G. Fowler (his wife), Cecil Fowler, James M. Fowler and Elizabeth Fowler, minor children of said James M. Fowler, Moses Fowler Chase, Frederick S. Chase, guardian of said Moses Fowler Chase, and Eliza Fowler, the widow of the testator.   The object of this suit was to quiet the title in Ophelia Fowler Duhme in absolute and unqualified fee simple to the lands set off to her in said partition.   Upon the complaint and a cross-complaint by said Moses Fowler Chase the issues were formed as to the proper construction of clauses *a* and *b* of said will, and as to the effect of said family settlement upon the interests of the parties thereto and of said Moses Fowler Chase.   Upon the trial the lower court found and stated specially the facts by us above stated, and stated further as conclusions of law from such facts :

"1.   That the plaintiff, Ophelia Fowler Duhme, is the owner in fee simple absolute of the real estate set apart to her in the partition proceedings in this court and described in her complaint and the amendments thereto, and that her title thereto be forever quieted as against all the defendants, their heirs and assigns and all persons claiming under them.

"2.   That the cross-complainant, Moses Fowler Chase, is the owner in fee simple absolute of the real estate set apart to him in the partition proceedings in this court and described in his cross-complaint and the amendments thereto, and that his title thereto be forever

quieted as against the plaintiffs, and his co-defendants, their heirs and assigns and all persons claiming under them.

"3. The death of any of the testator's children without lawful issue living at the time of such death mentioned in clause *a* of item third of said last will and testament, has reference only to a death occurring in the lifetime of the testator.

"4. The restriction upon alienation of the Benton county real estate attempted to be imposed by clause *b* of item third of said last will and testament, is void.

"5. James M. Fowler, Eliza Fowler, Ophelia Fowler Duhme, Charles H. Duhme, and Moses Fowler Chase are each and all bound by each and every provision of the instrument of writing of date February 7, 1891.

"6. James M. Fowler, Eliza Fowler, Ophelia Fowler Duhme, and Charles H. Duhme are each and all bound by the terms of the supplemental written instrument of date February 7, 1891.

"7. Eva G. Fowler, Cecil Fowler, James M. Fowler, Jr., and Elizabeth Fowler, or either of them, are not bound by any of the provisions of either said written instrument or supplemental written instrument of date February 7, 1891.

"8. Moses Fowler Chase is not bound by or entitled to the benefit of any of the provisions of the supplemental written instrument of date February 7, 1891.

"9. I therefore find for the said plaintiff, Ophelia Fowler Duhme, upon her complaint, and for Moses Fowler Chase, upon his cross-complaint, and that their respective titles to their said real estate be quieted."

Upon said conclusions of law, and in accordance therewith, the lower court rendered a decree, and by assignment of error and cross-error the question of the correctness of the several conclusions of law so stated

is presented to this court. The propositions of law involved in the various conclusions, so stated by the trial court, are also presented to this court upon assignments of error in the action of that court in overruling demurrers to the complaint and to the cross-complaint, and in denying the motion of the appellants for a new trial.

The inquiries arising upon the record are stated by counsel for the appellants to be as follows:

"1. Whether or not Moses Fowler, by item third of his last will and testament, and the codicil thereto, intended that the devisees named in said item and codicil—James M. Fowler, Ophelia Fowler Duhme, and Moses Fowler Chase—should take the real estate devised to them in fee simple absolute, or whether they should take it in fee simple, subject to be defeated by the death, without surviving issue of any of such devisees, whether such death happened in the lifetime of the testator or afterwards, in which case the real estate devised to the person so dying, without issue, should go by way of executory devise to the surviving devisees or their descendants.

"2. Whether the family agreement and supplemental agreement, executed by the defendant, James M. Fowler, operated as between him and the plaintiff, Ophelia Fowler Duhme, to vest in her a title in fee simple absolute.

"3. Whether the clause of item third of the will, imposing a restraint upon the alienation of the Benton county real estate for a term of years, has the effect to make the title devised to the other real estate a fee simple absolute.

"4. Whether Moses Fowler Chase can be given the benefit of the supplemental agreement executed by

Ophelia Fowler Duhme and her husband, and the appellants, James M. Fowler and Eliza Fowler, to vest in him a title in fee simple absolute to the real estate devised to him by the will of Moses Fowler."

Counsel, further stating their contention, make the following statement, which narrows the inquiries of this court: "The main question * * arises upon the contention of the plaintiff and cross-plaintiff that under the will of Moses Fowler his surviving children and grandchild, Moses Fowler Chase, severally took estates in fee simple absolute, to the real estate devised to them respectively. Their position is that clause '*a*' of item third of the will has reference only to a death occurring in the lifetime of the testator, and that clause '*b*' is void as being a restraint upon alienation, in violation of the statute upon the subject. We do not deem this latter contention to be at all material to the main question presented in the case, which is as to the proper construction of clause '*a*,' and, therefore, shall not enter into any discussion of the validity of clause '*b*.' Our contention is that clause '*a*' has reference to a death occurring after the death of the testator, and, therefore, that the estate devised by the third item to the testator's children and by codicil to his grandson, Moses Fowler Chase, was not a fee simple absolute, but a fee simple determinable upon the happening, after the death of the testator, of the contingency provided for by clause '*a*,' in which event the estate, in fee simple absolute, was limited over by way of executory devise to the persons named in said clause."

That the testator's intention must be our guide in construing the provisions of the will, is not subject to the slightest doubt. In ascertaining that intention, there are certain rules which have become as thoroughly settled as that which requires that the intention, when

ascertained, shall be the true guide. In *Moore* v. *Lyons*, 25 Wend. 119, quoting from Chancellor Kent, is the following statement concerning these rules: "The intention of the testator is the first great object of inquiry; and to this object technical rules are to a certain extent, made subservient. But with reference to a just limitation of this rule, he adds: 'To allow the testator to interfere with the established rules of law, would be to permit every man to make a law for himself, and to disturb the metes and bounds of property. So too in the Supreme Court of the United States, in the case of *Inglis* v. *Trustees of Sailors' Snug Harbor*, 3 Pet. U. S. *99, the English rules of construction of wills are declared and enforced to the extent that 'the intention of the testator is to be sustained, if it can be done lawfully and consistently; and also that a general intent in a will is to be carried into effect at the expense of any particular intent, provided such general intent be consistent with the rules of law; for when there are conflicting intents, that which is the most important must prevail.'" In *Allen* v. *Craft*, 109 Ind. 476, it is said: "Undoubtedly the cardinal rule in the construction of wills is, that the intention of the testator shall prevail; but where words are used which have a settled legal meaning, full effect must be given them." And, "The rule is that technical words shall have their legal effect, unless from subsequent inconsistent words it is very clear that the testator meant otherwise." Beach Wills, page 516; 2 Jarman Wills, 369; *Jesson* v. *Wright*, 2 Bligh, 1. Another rule is that the law so favors the vesting of estates and is so averse to the postponement thereof that they will be held to vest at the earliest possible period, in the absence of a clear manifestation of the intention of the testator to the contrary. *Petro* v. *Cassiday*, 13 Ind. 289; *Miller* v.

*Keegan,* 14 Ind. 502 ; *Davidson* v. *Koehler,* 76 Ind. 398 ; *Harris* v. *Carpenter,* 109 Ind. 540 ; *Davidson* v. *Bates,* 111 Ind. 391 ; *Davidson* v. *Hutchins,* 112 Ind. 322 ; *Amos* v. *Amos,* 117 Ind. 19 ; *Amos* v. *Amos,* 117 Ind. 37 ; *Bruce* v. *Bissell,* 119 Ind. 525 ; *Heilman* v. *Heilman,* 129 Ind. 59 ; *Wright* v. *Charley,* 129 Ind. 257 ; *Borgner* v. *Brown,* 133 Ind. 391. While this rule has usually been declared with reference to the vesting of remainders, it is, nevertheless, declaratory of the policy of the law which would prefer certainties rather than contingencies, and which would deny force and effect to an uncertainty raised by doubtfully expressed contingencies instead of resorting to slight circumstances and rendering them effective to defer the vesting of estates or to make their vesting contingent. This policy should not be relaxed when inquiry is directed to the force of words asserted to dismantle an estate in fee devised by apt words. This policy, in its application to the principal question now before us, was recognized by this court in *Wright* v. *Charley, supra,* and is but another application of the rule that a devise in fee may not be cut down by subsequent provisions of the will unless the intention to do so is manifest from words as clear, certain, and effective as those which created the fee. This application of the policy suggested has frequently been made by this court. See *Orth* v. *Orth,* 42 N. E. Rep. 277 ; *Mitchell* v. *Mitchell,* 143 Ind. 113, and cases cited in each.

Another rule, and that which is of the greatest significance in the construction of the will before us, is, as said in *Wright* v. *Charley, supra,* "That where real estate is devised in terms denoting an intention that the primary devisee shall take a fee on the death of the testator, coupled with a devise over, in case of his death without issue, the words refer to a death without issue

during the lifetime of the testator, and that the primary devisee, surviving the testator, takes an absolute estate in fee simple." This rule may be said to be almost, if not entirely, free from conflict upon the decisions, and there is no doubt of its adoption in this State and that it is supported by the vast weight of authority. As supporting this rule and as supplying many cases presenting the same questions which arise upon clause '*a*,' of item three of the will in question, we cite the following: *Harris* v. *Carpenter, supra; Hoover* v. *Hoover,* 116 Ind. 498; *Heilman* v. *Heilman, supra; Borgner* v. *Brown, supra; Gee* v. *Mayor, etc.,* 17 Ad. & El. (N. S.) 737; *Doe* v. *Sparrow,* 13 East, 359; *Clayton* v. *Lowe,* 5 B. & A. 636; *Howard* v. *Howard,* 21 Beavan, 550; *Crigan* v. *Baines,* 7 Simons, 40; *Clarke* v. *Lubbock,* 1 Younge and Collyer Ch. 492; *Cambridge* v. *Rous,* 8 Ves. jr. 12; *Rose* v. *Hill,* 3 Burr. 1881; *Woodburne* v. *Woodburne,* 23 L. J. Eq. (N. S.) 336; *Mickley's Appeal,* 92 Pa. St. 514; *Waugh's Appeal,* 78 Pa. St. 436; *Caldwell* v. *Skilton,* 13 Pa. St. 152; *Estate of Biddle,* 28 Pa. St. 59; *Fahrney* v. *Holsinger,* 65 Pa. St. 388; *Shutt* v. *Rambo,* 57 Pa. St. 149; *Moore* v. *Lyons, supra; Boraston Case,* 2 Coke 19; *Kelly* v. *Kelly,* 61 N. Y. 47; *Converse, Admr.,* v. *Kellogg,* 7 Barb. 590; *Livingston* v. *Greene,* 52 N. Y. 118; *Whitney* v. *Whitney,* 45 N. H. 311; *Briggs* v. *Shaw,* 9 Allen 516; *Quackenbos, Exr.,* v. *Kingsland,* 102 N. Y. 128; *Embury* v. *Sheldon, Exr.,* 68 N. Y. 127; *Cooper* v. *Williams,* Prec. in Ch. 73; *Goodtitle* v. *Whitby,* 1 Burr. 228; *Byrnes* v. *Stilwell,* 103 N. Y. 453; *Roseboom* v. *Roseboom,* 81 N. Y. 356; *Washbon* v. *Cope,* 144 N. Y. 287; S. C., 39 N. E. Rep. 388; *Benson* v. *Corbin,* 40 N. E. Rep. 11; *Vanderzee* v. *Slingerland,* 103 N. Y. 47; 2 Powell Devises, Chap. 36, p. 723.

In the case of *Gee* v. *Mayor, etc., supra,* the testator

devised all of his property to his seven children in equal proportions, the will containing, as to each child, a separate provision in terms as follows: "I will and bequeath to my eldest son. Adam Gee one-seventh of my property, to his heirs, executors and administrators." After such several provisions was the following: "And, in case any of my sons or daughters die without issue, that their share return to my sons and daughters, equally amongst them; and in case any of my sons and daughters die and leaving issue, that they take their deceased parents' share, share and share alike." It was held that the death and survivorship so mentioned should be held to refer to a time during the life of the testator.

In *Doe* v. *Sparrow, supra,* the testator devised property to a son and daughter, "their heirs and assigns forever" as tenants in common, and continued: "But in case of the death of either my son or daughter, leaving child or children, then as to the share of him or her so dying, I give the same to such his or her * children; but should there be no child or children, or, being such; all of them should die before the age of twenty-one years, then and in such case I give the share of him or her so dying to the survivor of them my son or daughter forever. But in case my said son and daughter shall be both dead at the time of my decease, without child or children, or leaving child or children, all of them shall die under the age of twenty-one years, and unmarried, and without child or children; then and in that case I give and bequeath the whole * * * to my executor, etc." The son and daughter survived the testator, and it was held that the first of the contingencies stated by the testator referred to deaths and survivorship during the lifetime of the testator, and the son and daughter each took in fee simple.

In *Clayton* v. *Lowe*, *supra*, the testator devised all of his property to his three grandchildren, and providing as follows : "And also that if either of my said grandsons * * or my said granddaughter * shall happen to die without child or children lawfully begotten, that then, I will, order and direct that such part or share * * of the one so dying shall be equally divided among the surviving brothers or sisters, share and share alike; but if it happens that. any of my aforesaid grandchildren shall die, and leave child or children lawfully begotten, that such child or children shall have their father or mother's share * * * equally divided among them." It was held that the contingencies stated were those which might arise only in the lifetime of the testator and that the primary devisees took an estate in fee simple.

In *Woodburne* v. *Woodburne*, *supra*, the testator devised his property to a trustee for his brothers and sisters with power to sell, the proceeds to go to the *cestuis que trustent* in equal proportions and as tenants in common, and the will continued, "and in case of any of my brothers and sisters shall depart this life without leaving lawful issue, then the share of him or them so dying, all and any of my real and personal estate shall go and accrue to the survivors or survivor of my brothers and sisters and be equally divided between them, share and share alike ; and that in case of the death of any other of my said brothers and sisters without leaving lawful issue, before such accruing or surviving shares shall become vested, then every such accruing and surviving share or shares shall again become subject and liable to such further right, chance or contingency or condition of accrual or survivorship as herein before is declared touching the original portions; and I do expressly declare that in case any of my brothers or sisters

shall have left issue of his or her body or bodies lawfully begotten, then my will is that such issue shall have and be entitled to such deceased parent's share or shares of and in my real and personal estate, if more than one, as tenants in common and not as joint tenants." It was held that the contingencies and conditions expressed in "the two clauses of accrual, although in some degree obscure, may both be read as referring to death and survivorship in the lifetime of the testator."

In *Mickley's Appeal, supra,* the testator devised his lands to his six children, all of whom survived him. The devise contained this restriction: "I direct that if either of my sons should die without leaving issue living at the time of his death, the share given to such son shall pass to and be divided among such of my children as may then be living and to the issue of such as may be dead, such issue, however, taking only the share of their parent."

As in the will before us, the contingency stated was death without issue at the time of the death of the named devisee with direction that the share devised should pass to the children then living (at the death of such devisee). In deciding the case Chief Justice Sharswood said: "It is very clearly settled, both in England and in this State, that if a bequest be made to a person absolute in the first instance, and it is provided that in the event of death, or death without issue, another legatee or legatees shall be substituted to the share or legacy thus given, it (the dying) shall be construed to mean death or death without issue before the testator. The first taker is always the first object of the testator's bounty, and his absolute estate is not to be cut down to an estate for life, or what is practically the same thing, to be subjected to an executory gift over upon the occurrence of the contingency of death or death without

issue at any future period within the rule against perpetuities, without clear evidence of such an intent."

The cases from which we have quoted are some of the decisions upon the authority of which the case of *Wright* v. *Charley, supra,* was decided. The cases of the general class are much more numerous than those we have cited and many of them present features in strong analogy to those presented by the clause of the will here in review. The case of *Caldwell* v. *Skilton, supra,* was where the testator, in the first instance, devised to his wife during her life or widowhood, "and at her decease or marriage, whichever first may happen, it is my will that all of my estate then remaining shall descend to and be enjoyed. by my children," who are named, "and in case of the death of either of my said children, his or her share or purpart to descend to the children of said child, or if said child should die without issue born alive, then the said share to be divided among and be .enjoyed by my surviving children, their heirs and assigns forever, share and share alike, as tenants in common." The wife's death preceded that of the testator and the court, construing the will, said: "I am satisfied from the reasoning submitted on the part of the plaintiff below, and upon the authority of all the cases, that by the phrase 'in case of the death of either of my children,' the testator did not mean death generally, or whenever it might happen, but in the contingent sense of death occurring within a particular time, in which case the devise over was to take effect by substitution, and not as a limitation engrafted on and qualifying the fee given to the children. It is very obvious it was not intended to cut down the absolute fee given to them in every event, and yet such must be the result if the testator meant the indefinite death of any of his children, contended for by the defendant

as marking the period of transmission. Under that reading, if the first takers died leaving children, the estate would go over to the latter, in fee, as purchasers, and if the former died, indefinitely without children, it would go to the surviving brothers and sisters absolutely. The practical effect would be to reduce the first estate to an estate for life merely, notwithstanding the explicit use of technical terms conferring a fee, evidently employed with a distinct notion of their legal meaning; *Clayton* v. *Lowe*, 5 B. & Ald. 636. Besides, that construction would render defeasible the original sharers first taking under the will, while those which might have proved by the clause of survivorship would vest absolutely; a consequence, certainly, never contemplated. * * * Congruity, therefore, requires that the chance of survivorship among the children of the testator, and the possible event upon which the limitation over to *their* children might take effect, should be referred to the same determinate period; or in other words, to let in the survivors on the death of any of their brothers or sisters, without issue, the contingency must happen within the same definite time, when, according to the settled rule of construction, the contingency implied from the words 'in case of the death of any of my children,' must occur to give place for the substitution of the grandchildren. * * * That circumstance, it is said, is naturally in regard to the time of its happening, and that time, where the gift is immediate, is necessarily the death of the testator." The following quotation from Powell on Devises is made by the court in support of the strong language we have copied: "Where, says he, a devise in fee is followed by several alternative limitations over, which aggregately provide for the death of the devisee under all circumstances; as where there is a devise over if he dies, leaving children, and another if he

die without children, the case then becomes analogous to that of the limitation if he die generally, and accordingly the words are held to refer to the death of the devisee in the lifetime of the testator." "Indeed," says the court, continuing, "to hold them to refer to death at any time, would be to cut down the devisee's estate in fee simple to an estate for life."

The very full and well considered case of *Moore* v. *Lyons, supra*, presented a will, where A was given a life estate, with remainder over to her three daughters "from and after her death," "or to the survivors or survivor of them, their or her heirs and assigns forever." Though the literal import of the words of survivorship could have carried the fee to those living at the death of the life tenant, the court held them to carry vested remainder to the three daughters immediately upon the death of the testator, and not depending upon the death of the life tenant. From the very learned reasoning, and exhaustive review of the cases, we quote the following from the opinion in that case: "It is a well-settled rule of law, recognized in our own State, that 'courts will never construe a limitation into an *executory devise* when it can take effect as a *remainder;* nor a remainder to be *contingent*, where it can be taken to be *vested.* It is true that before the abolition of feudal tenures in England, the courts of law in that country did favor *joint tenancies* over tenancies in common, as being more in harmony with the spirit and general policy of that period in relation to estates. But since the destruction of such tenures * * * the tendency of the courts, both of law and of equity, even in England, has been strongly in favor of *tenancies in common* over joint tenancies. Much more so should this be the case in our own State, where, since July, 1782, joint tenancies have been abolished in all cases, except

those expressly declared by deed or will to be such, and also as to executors and trustees. The distinctive feature of a joint tenancy, and that which is most inconsistent with the policy of our law, is the *jus accrescendi*, or right of survivorship. This, the courts of England have declared to be against equity, and it is not, therefore, now favored there in the courts, either by law or equity. But it is particularly inconsistent with the policy of our law, and the true spirit and character of our institutions. It favors the accumulation, in the hands of a single individual, of estates, which it is the policy and object of our law to divide by equal and extensive distribution. This, therefore, should not be favored. It should never be extended beyond the unquestionable law, or clear necessity of the case, especially to the prejudice of heirs."

At this point it may be well to suggest that a study of all of the cases will sustain the conviction that through the whole doctrine of directing the words of survivorship to the earliest definite period, the death of the testator, is that policy which opposes joint tenancies and favors tenancies in common, which lead to speedy and extensive distribution of lands.

That policy is, and certainly since 1843 (R. S. 1843, p. 417, section 18), has been, a part of the law of this State in that provision of the statute which requires that "All conveyances and devises of lands, or of any interest therein, made to two or more persons * * * shall be construed to create estates in common, and not in joint tenancy, unless it shall be expressed therein that the grantees or devisees shall hold the same in joint tenancy, and to the survivor of them, or it shall manifestly appear from the tenor of the instrument, that it was intended to create an estate in joint tenancy." See also R. S. 1881, section 2922; R. S. 1894, section 3341.

In *Livingston* v. *Green, supra,* the will presented stronger words directing the time when the estate in remainder should vest, as at the death of the tenant for life, than the case of *Moore* v. *Lyons, supra.* The remainder was not only given "from and after the decease" of life tenant, but it provided for the contingency of death with children, and declared the fee to vest "on the event happening of the death of" the life tenant, thus repeating the literal import of such words. It was held that the death of the children referred to a time during the life of the testator, and that the fee in remainder vested upon the testator's death.

Further cases of like effect are those of *Harris* v. *Carpenter, supra*; *Hoover* v. *Hoover, supra; Heilman* v. *Heilman, supra,* and *Borgner* v. *Brown, supra.* In each case the words of the will, by their ordinary import, directed the vesting of the fee in remainder to the time when the life tenant should die, but the rule of the cases quoted from was invoked and applied, and this court held, notwithstanding such words, that the fee should vest immediately upon the death of the testator.

In the Heilman case the will provided, that "after the death of my dear wife all my estate,  *  *  *  shall be divided into equal shares among my children, and if any of my children be dead, and have left children, then they shall be entitled to the distributive share of their parents." This provision was relied upon as creating whatever estate the children took under the will, and as apparently intending to defer the vesting of the estate in his children, a power of sale was vested in the wife and some of the children. This court held that the children took a fee at the time of the death of the testator.

The provisions of the will in *Wright* v. *Charley,*

*supra,* devised the lands in equal proportions to three children, the division to be made by the executors, if living, or by an administrator with the will annexed. It was then provided that "in case of the death of either of my children, * * and they leave no children, the property * * be divided between my children."

The conclusion reached by this court has already been stated, and is certainly in harmony with the weight of authority, so far as it holds that the estate taken by the three children vested immediately upon the death of the testator. The recent New York cases of *Washbon* v. *Cope, supra,* and *Benson* v. *Corbin, supra,* are strong among the class of cases we have cited. In the latter case a life estate was devised with a fee over, and the next clause read: "It is my will that, in case of the death of both my children, leaving no issue, that all my property given and devised to such children and their issue shall not pass to the branches of my family, or the family of my wife, but that all of it, personal or real, which I have the power to will, * * is hereby given, devised and bequeathed to the Domestic and Foreign Missionary Society," etc. These provisions, considered with relation to the time when the fee vested in the children and whether they expressed a contingency to follow the testator's death, which would cut down the fee, the court held that the death without issue meant a death during the testator's life, that the fee vested at once and was not defeasible.

The former of the two cases just cited construed provisions of a will containing an absolute bequest to a daughter, a residuary devise to that daughter and two sons, and these were followed immediately by an independent provision, as follows: "I furthermore desire and direct that in the event if my daughter * * shall

Fowler *et al.* v. Duhme *et al.*

die without children, the portion herein given to her shall be given to my sons  *  *  or their heirs, share and share alike." Accepting the latter provision as raising a possible doubt as to the time of the death of the daughter in the mind of the testator, the court applied the rules, first, that a doubtful contingency could not cut down that which had been clearly given, and second, "that where the devise or bequest over to third persons is not dependent upon the event of death simply, but upon death without issue or without children, the death referred to is death in the lifetime of the testator. The court, speaking by Peckham, J., said: "It is true that in some cases courts have stated that they would lay hold of slight circumstances to vary this construction, and give effect to the language according to its natural import, as referring to a death, under the circumstances mentioned, happening either before or after the death of the testator. But those circumstances must be such that a court can reasonably say there is good and fair ground upon which to base an alteration of the rule outside of and beyond the language which courts have heretofore held compelled them to enforce the rule as stated. When the language of a devise or bequest is such that the courts, without looking at any of the other provisions of the will, would say that such language meant, within the well settled decisions that the death spoken of was death before that of the testator, then the language in other portions of the will which is to alter that rule, must be such as at least to give fair, clear and reasonable ground for saying that its proper effect is to change the rule in question."

In the case of *Benson* v. *Corbin, supra,* it was said of permitting circumstances to vary the rule here under discussion: "If a slight circumstance or a slender

reason will, in ordinary cases, prevent the application of
the general rule, the circumstance or the reason must
be strong and decisive where the construction collides
with a plain devise in fee, and forces a change of its
terms by cutting it down to a lesser estate.   We do not
easily trade a certainty for a doubt."

In addition to what is said in these cases, and what
we have said of the policy of maintaining this rule
against doubtfully expressed contingencies, it was said
in *Mickley's Appeal, supra,* that the rule cannot be
overturned without clear evidence of an intention to
the contrary, and, in *Moore* v. *Lyons, supra,* that the
opposite policy "should never be extended beyond the
unquestionable law or clear necessity of the case, especi-
ally to the prejudice of heirs."

The following decisions of this court are cited by
appellants as sustaining the theory of an executory
devise.   *Jones* v. *Miller,* 13 Ind. 337, where the devise
to the first taker did not designate the estate to be
taken, whether a fee or a life estate, and it was made
upon the express exception that if the first taker died
without children, the property should go over to named
grandchildren.   The estate of the first taker, therefore,
if a fee, was cut down by conflicting provisions, regard-
less of the rule requiring certainty of intent to accomp-
lish that end, and the court did not consider the rule
which directs an indefinitely expressed death to the
period of the testator's life.   *Smith* v. *Hunter,* 23 Ind.
580, was of the same character and was decided in the
same manner, upon the authority of *Jones* v. *Miller,
supra.*   The case of *Stephens* v. *Evans, Admx.,* 30 Ind.
39, presented a will, not only nominating trustees to hold
the estate and to carry out its provisions, after the testa-
tor's decease, but provided that when the immediate
beneficiaries of the trust should forfeit their right to the

trust provision, by death as to one, and marriage as to the other, "thereupon, instantly and thenceforth" the property should "go to and become the absolute prop-. erty" of such children of said beneficiaries as should be living "at the happening of such contingency, and such others * * as might thereafter be born," and the children of any of such as should then be deceased, "as tenants in common in fee simple." The primary devisees were not given a fee to be cut down by con, flicting provisions; the will, by the trustee provisions and by the contingencies expressed, disclosed a purpose to defer the vesting of the fee in the children of the primary devisees until the happening of the events upon which that estate depended and subsequent to the testator's death.

The case of *Smith* v. *Heiser,* 51 Ind. 419, does not present the question of executory devises or conditional limitations.

The case of *Helm* v. *Frisbie,* 59 Ind. 526, held that a devise of a life estate to one, with remainder to one of two classes, depending upon the contingency of the survivorship of one class to the age of majority, did not vest a fee in the first taker, the life tenant.

In *Greer* v. *Wilson,* 108 Ind. 322, the will in one clause gave to the testator's daughter a fee simple, and in a subsequent clause it was declared to be the testator's will that if the daughter should die without a child surviving her, or if she left a child and it should not attain full age, the property should go over to persons named. The daughter died leaving a son, who attained to full age. One-third of the land was sold as the property of the deceased daughter's widower. In partition between the purchasers and the surviving son of the devisee it was held by the trial court and affirmed

by this court that the devisee took a fee which did not terminate. It was therefore an unimportant inquiry as to the effect of the contingencies so expressed to cut down the fee given or to limit the fee over. The rules of construction considered in the more modern cases in this court, above cited, were not considered, and were unnecessary to a proper solution of the question there at issue.

In *Pate* v. *French*, 122 Ind. 10, the testator devised his "farm" to his seven sons in equal proportions. By a codicil he said: "In my said will I have made certain bequests and legacies to my children of my property, real and personal. Now, I further provide, direct and order, that in case any of my sons or daughters shall die, and leave no heirs, children of their body, then the estate so willed to them shall go to their brothers and sisters, and the children of such as might be deceased." This court fell into an error, in our judgment, in regarding the primary devise as carrying an estate in fee simple. The only description of the property or estate devised was the words "my farm." Since 1852 there has been no statute in this State changing the rules of the common law as to the language necessary in a will to carry a fee simple, and where the devise is to another generally, as by designating the tract or parcel, and there is no expression indicating a purpose to part with the testator's whole estate, it is but a life estate. *Smith* v. *Heiser, supra; Roy* v. *Rowe*, 90 Ind. 54; *Ross* v. *Ross*, 135 Ind. 367. The cases of *Jones* v. *Miller, supra*, and of *Smith* v. *Hunter, supra*, were of like character.

In none of these cases was the rule considered which directs the generally expressed survivorship of devisees to the lifetime of the testator. The fact that in each case but a life estate was given to the first taker, if we

are correct in our understanding of the cases, afforded no opportunity for declaring an executory devise limited upon a fee.   If we are in error as to the question properly arising in these cases there is no room to reconcile them with the numerous recent cases we have already cited and commented upon from this State.

Regarding the rule as settled that a devise to one with a devise over upon the death of such devisee does not express a contingency to arise after the death of the testator, and that such expressed contingency will not affect the estate of the first taker if he survive the testator, and regarding this rule as supported by so many wise considerations of public policy and private right, we conclude that slight circumstances or trivial inconsistencies may not overturn it, but that the testator's intention to express a contingency to happen after his death, to affect the estate devised to the first taker, must appear distinctly from the clear and consistent language of the whole will unless the inconsistency arises from a manifest purpose to modify existing provisions by those subsequently introduced.   In other words, since a devise of an estate, defeasible upon the happening of a contingency, may be so easily expressed, and since such estates stand in disfavor before the law, the intention to create such an estate must be denied unless such intention has been made certain by the language of the whole will.

Omitting the contingencies expressed in clause "*a*" of the will before us, it is without doubt or question that the language of the will carries to the devisees estates in fee simple absolute as tenants in common. The devise is to them "and to their respective heirs forever."   These are technical words aptly used and clearly creating an estate in fee simple.   They are the exact words of the devise to the widow where no doubt

is suggested of the testator's intention to create an estate in fee simple. The repetition of the words, after employing them advisedly to carry a fee, indicates with certainty the testator's knowledge of their legal effect. It is said that this fullest and most perfect estate was created with the deliberately formed purpose of cutting it down to an estate of doubtful quality and one less valuable and satisfactory than a mere life estate, to an estate the quality of which could only be determined upon the death of the immediate devisees respectively. This intention to mangle the estate thus purposely set up in legal form is said to be manifest from clause "*a*" of the same item of the will which created it, and is said to have been prompted by an antipathy for his wife, which would deny her any interest not given directly, and by a desire to continue, to the most remote period, in the hands of those of his own blood the large landed estate accumulated by him. Upon the construction contended for by the appellants, had Mrs. Chase survived her father and died without issue surviving her, one-half of her estate would have vested in Ophelia, then unmarried and childless, in fee simple to descend, upon her death, one-half to her mother and one-half to James. In the contingencies supposed, James would have taken three-fourths of the estate devised to Mrs. Chase, one-half directly and one-fourth from Ophelia, in fee simple to descend to his wife and children, or to be disposed of by conveyance to strangers. Thus, it is seen, both motives suggesting the executory devise claimed would have been defeated.

It is insisted, however, that the devise in fee was made, by the language of item three of the will, to depend upon the expressed condition that it should be determinable upon the contingency stated in clause "*a*." Treating this clause as a condition subsequent, we find

Fowler *et al.* *v.* Duhme *et al.*

no relief from the already apparent inconsistency of a devise in fee simple, which, practically, is but a life estate, upon the construction of the appellants, since the death of the devisee, with or without children surviving, is a necessary element in determining the quality of the estate taken. It is manifest that the clause could not be accepted as a condition precedent, for it involves that which deprives the first taker of all estate, namely, his death. The office of a condition subsequent is to divest an estate, vested and continuing to the happening of the event or breach specified. A fee not capable of transmission, and determinable at death, with provision for its vesting definitely only at that time, the objects of the ultimate estate remaining contingent meanwhile, is nothing more than a life estate with the fee in abeyance. Without stopping to comment upon the fatality of this conclusion to appellants' insistence that a fee simple absolute was withheld from the several devisees, we must conclude that no such incongruous purpose as that involved in the proposition just stated is probable. By the language of item three, clauses "*a*" and "*b*" are both made "conditions," and appellants' learned counsel concede that such designation of clause "*b*" is a misnomer. It is an attempted restriction upon alienation, and is in no sense a condition as it supplies no prerequisite to the vesting of title and no requirement the breach of which would divest title. In looking to clause "*a*," therefore, as constituting a condition subsequent, we do so with the conviction that the testator did not characterize it as a condition with accurate knowledge of the force of the term, and we do so, having in mind the rule that conditions subsequent, as they tend to destroy estates, are not favored by the law, and must be taken strictly. 6 Am. and Eng. Ency. of Law, p. 902, note 1. The clause is

but the equivalent of those contained in many of the cases cited by us, and from which we have quoted. It expresses a contingency in which the property devised should go to others than the named devisees, but omits to state the time within which such contingency must happen. The law supplies that omission by holding that the time shall be directed to a period before the testator's death. If the clause read: "In the event of the death," before my death, "of any of my said children," etc., there could be no reasonable ground of contention, and, as we have seen, the law supplies these words where to do so they do not oppose the manifest intention of the testator. Here, as in *Boraston's Appeal,* supra; *Moore* v. *Lyons, supra*; *Doe* v. *Sparrow, supra*; *Woodburne* v. *Woodburne, supra,* and *Mickley's Appeal,* counsel attach considerable importance to the adverb of time *then,* as employed in the clause in question, and seek to refer it to the death, at any time, of the immediate devisee. Such words are held by the cases cited not to relate to the vesting of the estate in interest. The word as employed has direct reference to an event, the death of a child, and not to a time. This use of the word is consistent with the construction of the clause which requires us to apply the rule of survivorship to a period during the lifetime of the testator, it is consistent with the idea that a will speaks with reference to conditions which may exist at the time of the testator's death, it is consistent with the closing phrase of the clause: "The descendants of any deceased child taking between them the share which, if living, would have vested in their father or mother." *Vesting* occurs at the death of a testator and not before.

The word, as it is each time employed, is not inconsistent with the idea of a contingency, the death of a child, occurring during the life time of the testator, and

as we have seen, it must be found inconsistent with that idea before we could give it effect to deny the application of the rule directing the time of indefinitely expressed survivorship.

Counsel urge that to accept clause "*a*" as a provision in substitution for the devises made in the first instance renders the clause futile since the statute would have rendered the same substitution.    This argument would apply in every instance of clause in substitution, and if it were to prevail, would make the existence of the statute of paramount influence in ascertaining the intention of the testator, and the denial to him of the privilege of substituting.

It is insisted further that if the testator intended by the language of clause "*a*," to refer to a death in his own lifetime there would have been no occasion to have disposed of his personal estate by a separate item, as done by item four of his will; that in this item he correctly provided a substitution by directing the period of survivorship to the time of deaths during his own lifetime.    To have included the personal estate in item three, having in mind the purpose to restrict the alienation of a large portion of the realty, and having no such purpose with reference to the personalty, would have complicated the bequests and devises and added confusion in the construction of the will.    The fact that he clearly expressed, in this item, the contingency of a death during his own lifetime lends emphasis to the contemplation of a possible death of one or more of his children before his death.    While the language of item four, in this respect, is clear and beyond the limits of dispute and evinces a knowledge of proper forms of expression to disclose his purpose to substitute the bequests, when we go back to item three and read it, having in mind the testator's conception that his chil-

dren might die before his death, and remembering that it was then an established rule of construction that a will devising to one with a provision over in case of the devisee's death was to be held a death during the testator's life we find no inconsistency in the two provisions, but do find that in the fourth item he expressed clearly that which in clause "*a*" he must be deemed to have known the law defined for him.

It is said also that it is the essence of a substituting clause that the substituted devisee shall take precisely the same estate the original devisee would have taken; that the devisees under clause "*a*" take a fee simple absolute, while the original devisees take only a fee simple conditional or determinable. This argument proceeds upon the concession of all that appellants claim for clause "*a*." If the premises, the sole question under consideration, were conceded, this question would be closed.

Finally it is said that in the codicil the testator made clear whatever doubt might have arisen as to his intention in clause "*a*," and that such intention was to refer to deaths occurring after his own death. As we have seen, four years had elapsed since the execution of the will and his daughter, Mrs. Chase, had died, leaving her only child, Moses Fowler Chase, surviving her. The codicil was executed at this time and by it the testator devised "in fee simple" to his said grandson the share in his real estate which by the will was devised to Mrs. Chase, "he taking the same subject to the same limitations and restrictions which" Mrs. Chase "would have taken the same under said will had she survived" the testator. He then declared it to be his will that his grandson take the same share in his real estate as well as his personal property which Mrs. Chase would have taken under the will had she survived him, the testator.

It is quite evident that the codicil was not drawn with great care. While manifestly intended as a provision in substitution for the lapsed provisions made for Mrs. Chase the bequest of the one-third of the vast personal estate of $850,000.00 falls, almost casually, within a phrase apparently explanatory of the words devising the realty. In item three of the will neither of the words "limitations" and "restrictions" is employed, nor is there a plurality of limitations or restrictions made in and by that item, though the codicil, by using those words, certainly refers to language in item three. Clause "*b*" is a restriction, though in item three it is designated as a "condition." The words of item three "and to their respective heirs forever" are technically words of limitation and not of condition. If clause "*a*" is a condition, as contended by the appellants, that conclusion, as we have shown, must appear from the clear and positive language of the testator following that clause, and, at this point of consideration, it must so appear from the language of the codicil. The word "limitations," so far as it participates in carrying an estate over after the expiration of a particular estate, is more comprehensive than the terms "conditional limitation," and yet counsel insist that the devise made by item three of the will is made a conditional limitation by uniting the word "condition," used in item three, with the word "limitations" as used in the codicil, or rather that the word "limitations" gives meaning to the word "condition." If the word "limitations," used in the codicil, is given a technical construction, it applies and has reference to the words "and to their respective heirs forever" as they were employed in item three to confer an estate of inheritance upon Mrs. Chase. To apply the word to clause "*a*" requires us to narrow the scope of the word to mean "conditional limitation."

The former will harmonize with the rules of construction we have applied to clause "*a*," while the latter would conflict with those rules and the policy of the law which supports them.    If we construe the word "limitations" in the ordinary sense of restriction or restraint, it may apply to the qualification or modification of the fee by clause "*b*," and it is no objection to this application of the word that it multiplies references to a preceding provision or modification, since the testator has himself, by the use of either of the words "limitations" or "restrictions," employed a plural form of reference to a singular predicate.

The concluding phrase of the first paragraph of the codicil was not inserted alone to bequeath the personalty to the grandson, but was to disclose the testator's purpose in making the codicil.    After making the devise he continued, not even breaking the paragraph with a period : "It being my will that my said grandson shall take the same share in my real estate, as well as in my personal property, which his mother would have taken under said will had she been living at my death." These explanatory words bespeak the testator's intention to merely substitute his grandson for his daughter to that estate which he had provided for her by the will.    If, under the will, disregarding the codicil, we should conclude that Mrs. Chase would have taken a fee simple unconditionally, and that the words of clause "*a*" did not constitute a conditional limitation, but did constitute a substitution of children, or grandchildren, who should survive the immediate devisees in the lifetime of the testator, the words last quoted from the codicil are in perfect harmony with that construction.    The word "limitations," if used in the same sense that "condition" was used in item three, would simply mean that if Moses Fowler Chase should die in the lifetime of the

testator, and without issue, the estate provided for him should devolve upon the testator's surviving children or their children. The objection to this construction of the word "limitations" is that the words "had she survived me" suggest an intention to have provided, by the will, for the contingency of Mr. Chase's death after that of the testator. Applying both the words "limitations" and "restrictions" to clause "*b*," or adopting the technical meaning of the word "limitations" and applying "restrictions" alone to clause "*b*" and the phrase "had she survived me" would not mar the consistency of that construction of clause "*a*," which would direct it to events happening in the lifetime of the testator. If, as we believe it to be our duty, we must seek that construction of all of the provisions of the will which will best harmonize with each other, with the rules of construction, with public policy and private right, and will cast out none of the words, we must adopt that which is included in one of the alternatives just suggested. Either alternative is against the contention of the appellants.

We next turn our attention to clause "*b*" of the will, not for the purpose of determining whether an implied power of sale as to all other lands than those therein pointed out is given, as appellees maintain, but for the purpose of considering its legal force as a restriction upon the alienation of the lands so pointed out. The language of the clause and the testator's purpose therein stated leave no room for construction. They are explicit and direct in forbidding the sale or alienation of the Benton county real estate or any interest therein, by the devisees or their heirs, for the definite period of twenty-five years from the date of the will. No trust feature is connected with the restrictions, and it is made without the slightest reference to or dependence upon

the duration of a life, or any number of lives in being at the execution of the will or upon the devolution of the estate devised. The estate devised, as we have seen, was a fee simple absolute, not deferred nor dependent upon any precedent estate, and not subject to any limitation or condition of forfeiture.

Our statute provides, as it did when this will was executed, that ''The absolute power of aliening land shall not be suspended by any limitation or condition whatever, contained in any grant, conveyance or devise, for a longer period than during the existence of a life, or any number of lives, in being at the creation of the estate conveyed, granted, devised and therein specified,'' with an exception stated, and which does not affect the devise here under consideration.

Appellants' learned counsel, moved perhaps by the conclusion that the interests of their clients would be best subserved by a decision that the restriction of the clause is void, have dismissed the question with the suggestion that by the cases of *Langdon* v. *Ingram's Guar.*, 28 Ind. 360 ; *Stephens* v. *Evans, Admx., supra; Andrews* v. *Spurlin*, 35 Ind. 262, and *Shimer* v. *Mann*, 99 Ind. 190, the restriction is not void under our statute.

Desiring to narrow the question to its exact limits, it is conceded by us that there may be many instances in which a partial restriction upon the power of alienation may be valid, as with reference to classes of purchasers, and the uses to which the property may be applied and possibly where the estate of the devisee is contingent or is otherwise deferred and not vested, though we make this latter concession simply to narrow the question at issue, and while fully aware that the statute says: ''The * power of aliening *lands* shall not be suspended.'' The exact question here presented is this: Can there be a valid restriction, in point of time alone,

which does not depend upon the duration of a life, or lives, in being at the time the estate devised is created, disregarding for the purposes of this inquiry the exception specified in the statute?   To what extent our statute answers this question, has not, so far as our knowledge and research have disclosed, been presented to, or considered by, this court in any case.   It was certainly not considered in any of the cases cited by the appellants upon this branch of the present case.

The power to restrict alienation belongs to the feudal system, and had its chief, if not entire, support from the idea that the primary or principal estate continued to exist in, or upon the extinguishment of the estate granted reverted to, the lord upon whose conveyance it vested.   As early as the year 1290 the statute *quia emptores* was passed, providing "that from henceforth it shall be lawful for any freeman to sell, at his own pleasure, his lands and tenements, or part of them, so that the feoffee shall hold the same lands and tenements of the chief lord of the same fee by such service and customs as the feoffor held before."   By this statute the possibility of reversion was cut off and the reason which supported the restriction no longer existed.

An extended and able opinion, perhaps the best in the books, giving the origin, history and abolition of restrictions upon alienation generally and the proper exceptions to the present common law and statutory rules, is that of Ruggles, C. J., in *De Peyster* v. *Michael*, 6 N. Y. 467; S. C. 57 Am. Dec. 470, with extended notes.

The spirit of the statute just quoted has taken form in almost every State in this Union, and while, in some respects, the statutes of the different States are different in their language, they all seek to maintain the central

idea that one possessing property should not be denied the natural right of alienation. It must be conceded, of course, that ownership is subject to many grades and variations of interest, but the proposition about which there can be no substantial disagreement, is that a vested estate in fee simple is the freest and fullest estate of which man can become the owner. To say that such an estate exists in one who is denied the power of alienation, is to say that he has not an estate which is unfettered, an estate which is a fee simple absolute. As said in the note above referred to: "The power of alienation is one of the most valuable rights of ownership, and any attempt to cut off this right from the highest estate known to the law, must obviously be unavailing. To say that one shall have an estate in fee simple in land, and yet that he shall not alienate it, is to say that he shall have an estate, and at the same time that he shall not have it, for an inalienable estate in fee is an absurd impossibility." This expresses the idea underlying the whole doctrine maintaining the freedom of alienation.

Having this idea in view, and having ascertained that the will in question devised to the devisees a fee simple absolute, we must consider the effect of the restriction imposed, and the power to impose it. If there were no statute in this State denying the power to restrict alienation, we should regard the antagonistic character of the restriction here imposed upon the fee of the devisees as calling for careful and deliberate consideration, and most reluctant assent, if it were given at all. To say that one owns land, but may not part with any interest in it for twenty-five years is not only to say that he does not possess that exalted estate known as vested fee simple, but that he does not own a life estate, for that ordinarily may be sold, and the

Fowler *et al.* v. Duhme *et al.*

restriction may extend far beyond his death, and leave an estate of doubtful character thereafter, until the expiration of the restrictive term. We are aware that many judges and text writers have said that partial restraints upon alienation and restraints for a limited time are valid. In some instances such expressions have been where the estate held by the restricted owner was not a fee, in others where the restraint was but partial and not absolute, as where the sale to particular persons or uses was denied, and in some where the restriction was not directed to a particular time, regardless of statutory provisions. The leading case in this country, as to restrictions in point of time, *Mandlebaum* v. *McDonell*, 29 Mich. 78, s. c. 18 Am. Rep. 61, involved a restriction for a definite period of years, until a grandson "shall be twenty-five years of age, or until twenty-one years from the date" of the will, "in case of his death." In that case we are spared the labor of disclosing the origin of the error in supposing that a fee may be made to carry a rider in the nature of a restriction upon alienation for a definite time. It is there clearly shown that those who have fallen into this error have relied upon a misconception of early cases, and cited them, without examination, as authority. Of our own case of *Langdon* v. *Ingram's Guar.*, *supra*, it is there correctly said that it "was a devise of real estate to the widow, in trust for the benefit of children, and the restriction was upon her power to convey until the youngest of the children should become of age. I see no objection to this," said the learned judge, "so long as it did not violate the rule against perpetuities. But so far as anything is said upon the right of restricting the power of sale generally of an estate in fee when the conveyance is made directly to the party himself,

and for his own benefit, it was aside from the case, and not authority."

So we may say of the case of *Stephens* v. *Evans, Admx., supra,* where the primary estate was in trustees, and the court held the fee to be contingent, and not vested in the ultimate devisees. It was said, evidently without reference to the statute, that a limitation over by way of executory devise, in order to be valid, must vest in possession within a life or lives in being, and twenty-one years and nine months at the farthest. We do not regard the case or the conclusion so stated as bearing even slightly upon the question now under consideration.

In the case of *Andrews* v. *Spurlin, supra,* the deeds conveyed to the grantee for life, "and after her death to descend to the heirs of her body," with the superadded words that the grantee, "in consideration of this deed, receipts and forever quitclaims to any further interest in and to her father's real estate, whatever, and that a transfer of said real estate by said" grantee "shall in no wise be valid." It was held that by the rule in Shelley's case the grantee took a fee simple, and that the concluding words in restriction did not relate to the fee granted, but to the grantee's further interest in her father's real estate. The learned judge who wrote that opinion, after so deciding the only questions in the case, incidentally remarked that "A grantor may restrict or limit the power of alienation for a period of time, but an absolute prohibition is void." This dictum is certainly not authoritative.

In the case of *Shimer* v. *Mann, supra,* a devise was made to Samuel B. Mann of the rents and profits of a tract of land until his youngest child should come of age, "upon the happening of which event," it was provided "that the fee simple in said land" should "then vest

absolutely in the said Samuel B. Mann and his heirs."
Before the youngest child became of age Samuel B.
Mann conveyed and warranted the land to Shimer and
when that son became of age he sought partition against
Shimer upon the theory that the will made the son a
devisee. It was held that the word "heirs" was a word
of limitation and that at the expiration of the first estate
the fee vested in Samuel B. Mann. It was said that it
was not uncommon to convey an estate less than a fee
which, upon the happening of a contingency, is made to
enlarge to an estate in fee. This, it was said, was the
effect of the devise in question. Though the eminent
judge who wrote the opinion in that case discussed the
effect of combining the contingent estate and the
primary estate in the same person and expressed the
conclusion that "conditions like the one written in this
will are effective, for they do not unreasonably restrict
the power of alienation," such questions were of doubt-
ful application to the case, since by the rule in Shelley's
case the youngest son took no estate, and the fee having
vested in Samuel B. Mann was carried to Shimer by
the warranty deed. At that point the case was decided
and it was beyond the scope of the issue to determine
that the will was a restriction upon alienation. It cer-
tainly is not authority to the proposition that the owner
in fee may be denied the power of alienation for a
definite number of years. So far as any of these cases
may be said to interpret our statute denying the power
to restrict alienation, they are without force.

To return to the case of *Mandlebaum* v. *McDonell*, it
is there said of the restriction, which was imposed not
as a condition the violation of which would divest the
estate, nor with other penalty or forfeiture as to the
devisee or advantage to another, that "A legal obliga-

VOL. 143—19

tion always involves the idea, not only of a party upon whom it rests, but of another party in whose favor or for whose interest or benefit it is imposed, and who, therefore, has a right to call for its enforcement.

"To give vitality and force to the current of legal obligation, it requires, like the galvanic current, a battery with two opposite poles, between which the current is to pass and the force to operate. A circuit formed upon only one remains quiescent. The force of gravitation itself would cease to act, if not to exist, without at least two bodies (or particles) between which it could be exerted. And it is not easy to see how this restriction can impose any legal obligation upon the devisees or limit their power over the estate, when the observance or violation of the restriction can neither promote or prejudice any interest but their own ; and it has not been claimed that any other interest could be affected here. Let us test this a little further by a few analytical questions. In whose behalf, for whose interest, is the restriction imposed ? Is it not solely for that of the devisees themselves ? And who has a right to enforce it or complain of its breach ? What species of legal tie or obligation is that which attaches only at one end, and, ending where it begins, operates only in behalf of the very party upon whom, or on whose property it is imposed, making him at the same time obligor and obligee ?" etc. It is further said that "In either case, as it seems to me, can the restriction be regarded as anything more than the expression of a desire, or the mere advice of the testator, which, though the devisees might choose more or less to respect, they had a clear legal right to disregard."

In the note to *DePeyster* v. *Michael, supra,* a number of cases are collected which hold a gift over necessary to validate a restraint on alienation and the conclusion above stated from *Mandlebaum* v. *McDonell* is affirmed.

All that is said upon this proposition has pertinent application to clause "*b*" of the will before us. The idea that the clause was advisory and not mandatory is supported not only by the absence of condition or penalty but by the fact that of the real estate in Benton county there were between 900 and 1,000 town lots in the town of Fowler, probably the only lots affording an expansion of the county-seat bearing the testator's name, and the value of which, to say nothing of taxes and street improvements, would be destroyed by the impeded growth of one of the most promising towns in our State for a quarter of a century.

The restriction, by its letter, includes these lots, and yet there was that want of care concerning the entire clause that the testator was made to say, by it, that he imposed the restriction because of the character of the investment afforded by the management and cultivation of the real estate. To presume that he intended these lots to withdraw from the market, and return to agricultural uses for twenty-five years does not carry the force of reason which would support the view that the clause was intended as advisory. We need not, however, make a choice between these views, since it is our firm conviction that the clause violates the statute, and is void.

Prof. Gray, in his work on restraints on alienation, says, section 54: "The weight of authority, and especially of reasoned authority, is against the validity of restraints upon alienation however limited the time," citing *Roosevelt* v. *Thurman*, 1 Johns. Ch. 220; *Oxley* v. *Lane*, 35 N. Y. 340; *Twitty* v. *Camp*, Phil. Eq. (N. C.) 61; *Mandlebaum* v. *McDonell, supra*; *Anderson* v. *Cary*, 36 Ohio St. 506. In *Oxley* v. *Lane* the restriction was for twenty-five years from the testator's death, the estate devised being a fee, and it was held

void for repugnancy. In *Roosevelt* v. *Thurman* the restriction was until a son of the devisee should attain his majority and the opinion, by Chancellor Kent, held the restriction void for repugnancy. The case of *Twitty* v. *Camp* was of a like character, the restriction being until the devisee should reach thirty-five years of age.

By the statute of New York "The absolute power of alienation shall not be suspended by any limitation or condition whatever, for a longer period than during the continuance of not more than two lives in being at the creation of the estate," with an exception similar to that which exists by our statute and which forms no part of the question now in hand. This statute is in similar words and in effect differs from ours only in that ours permits a restriction during any number of lives while this limits it to two lives. The two statutes may, therefore, be taken as identical for the purposes of determining whether a restriction for a definite number of years is a restriction of the "absolute power" of aliening lands.

In *Field* v. *Field*, 4 Sand. Ch. 563, it was said: "The statute restricts the suspension of alienation and ownership to lives, and upon life only. It does not admit of a suspense for a term of years, however short," nor a suspense "dependent in part upon life and in part upon a fixed period of time."

In that State the question has often arisen where the power was sought to be restrained through the intervention of trustees for a definite period of time, and, says Bolles in his work on the Suspension of the Power of Alienation, section 78: "This rule has been often applied, the period running down from twenty-one years to three," citing *Hones, Exr.*, v. *Von Schaick*, 20 Wend. 564 (21 years); *Rose* v. *Rose*, 4 Abb. Ct. of App. Dec. 108 (5 years); *Gano* v. *McCunn*, 56 How. Pr. 337

(6 years); *Beekman* v. *Bonsor*, 23 N. Y. 298 (15 years); *Morgan* v. *Masterton*, 4 Sand. 442 (3 years); *Will of Underhill*, 6 Den. 466 (3 years); *In re Starr*, 2 Den. 141 (12 years); *Rice* v. *Barrett*, 102 N. Y. 161 (10 years); *Dodge* v. *Pond*, 23 N. Y. 69 (10 years); *Butler* v. *Butler*, Hoff. Ch. 344 (12 years); *Smith* v. *Edwards*, 88 N. Y. 92 (20 years); *Bean* v. *Bowen*, 47 How. Pr. 306 (5 years).

Considering the same statute, it is said, in Chaplin on the Suspension of the Power of Alienation, section 91: "Nor is it enough that the provisions of a given instrument are such that the suspension *may* terminate by the end of two lives. It must be drawn so that the suspension inevitably *must* so terminate. The rule is sometimes stated thus: Where, by the terms of the instrument creating an estate, there may be an unlawful suspension of the power of alienation, the limitation is void, although it turns out by a subsequent event, as by the falling in of a life, that no actual suspension beyond the prescribed period would take place." Many cases are cited in support of the text, and from our examination of some of them we can say they support the conclusions stated. Again, the same author, speaking of such statutes generally, says, section 141: "The statutory prohibition against suspension of the absolute power of alienation, beyond the statutory period, extends to 'any limitation or condition whatever.' Restrictions upon the alienation of real property by its absolute owner are within these terms, and must be confined within the term measured by lives." In support of this proposition is cited the case of *Mandlebaum* v. *McDonell*, *supra; Hartung* v. *Witte*, 59 Wis. 285; *Bridge* v. *Ward*, 35 Wis. 687; *Greene* v. *Greene*, 125 N. Y. 506. To the same effect are *Hall* v. *Hall*, 123 Mass. 120; *DeWolf* v. *Lawson*, 61 Wis. 469; *Hawley*

v. *James*, 16 Wend. 60 ; *Tucker* v. *Tucker*, 5 N. Y. 408; *Rand* v. *Butler*, 48 Conn. 293 ; *Boynton* v. *Hoyt*, 1 Denio 53.

Many of the cases, which seem to support the claim that a partial restriction of alienation as against a fee is not void, do so upon the assumption that invalidity depends upon the reasonableness or unreasonableness of the restriction. In fact, this assumption has been made in some of our own cases, to which we have already adverted, but, when it is remembered that we have a statute forbidding the *suspension* of the "absolute power of aliening," we are at a loss to know by what rule we should determine when a restriction is but a reasonable violation of its terms, and when it may be known that the restriction is so unreasonable as to violate its terms. If there were no statute, the doctrine of reasonable or unreasonable restriction would certainly be full of doubt and uncertainty, if not injustice and inconsistency. The only safe rule, we apprehend, is to resort in every case to the statute and determine whether its inhibition has been violated. It lays down a definite rule as to the period of suspension, and all other suspension is positively forbidden. That period is measured by the existence of lives in being when the estate is created, no other rule of admeasurement is admitted.

The word "absolute" has no reference to time, but rather to the power, the privilege of aliening. In the case before us the power to alien is completely and absolutely denied for twenty-five years. The word "absolute" could not mean *for all time*, since that would disagree with the word *suspended*, implying temporary denial, and with the declared right to suspend the power during the period of certain lives, and, by implication at least, not beyond such period. Who shall say

that the restriction imposed by clause "*b*" does not extend beyond the lives in being of all persons interested proximately or remotely in this estate? Can it be that the positive command of the statute may be made the object of mere chance, and that parties. and courts must await the effectual lapse of the period prescribed to learn if the statute has been violated? Certainly not. All power to suspend alienation is denied, with certain exceptions, and those who claim to be within the exceptions must make clearly manifest the validity of their claim.

In our judgment the conclusion is inevitable that clause "*b*" is void under our statute.

The effect of the contracts of family settlement, in view of our construction of the will, is of no importance and is not passed upon.

The judgment of the lower court is affirmed.

Filed January 10, 1896.