ABERNATHY *v.* McCOY ET AL. AND FOUR OTHER CASES.

[Nos. 12,223-12,227. Filed December 23, 1926. Rehearing denied December 7, 1928. Transfer denied July 3, 1930.]

*Joseph B. Ross, William C. Mitchell, Williams & Murphy* and *Abernathy & Simpkins*, for appellant.

*Clyde H. Jones, Miller, Dailey & Thompson, Stuart, Simms & Stuart, Crane & McCabe, A. N. Foley, Thomas F. Moran, Jr.*, and *D. M. Patrick*, for appellees.

ENLOE, J.—One John Evans, a resident of Ohio, died testate in Ross County, Ohio, in 1842, the owner of several large tracts of land in Tippecanoe County, Indiana. He executed his last will and testament on May 24, 1837, and a codicil thereto on September 25, 1838. After his death, the said will, with the codicil thereto, was duly probated in the court of common pleas of said Ross County on January 11, 1842. Thereafter, by order of the Tippecanoe Probate Court, and upon due application in that behalf, a certified copy of said will was, on February 17, 1845, recorded in the record of wills of Tippecanoe County.

The said John Evans left surviving him, two daughters, Mary Ann G. Boggs and Minerva C. Evans, and also two grandsons, Edward O. Stevenson and Job E. Stevenson, children of a deceased daughter.

The lands owned by said John Evans, in Indiana, at the time of his death, were disposed of under the tenth item of his will, said item, so far as the same is material to the consideration of this case, being as follows:

"Item Tenth. All the rest and residue of my lands and real estate wheresoever situated, and by whatsoever title held and to which I may have claim or title at the time of my death . . . shall be divided into three equal shares or parts . . . and . . . I hereby give and bequeath unto my daughter Mary Ann G. Boggs unto one-third part unto my daughter Minerva C. Evans and unto the remaining one-third part unto my Grandsons Edward O. and Job E. Stevenson as tenants in common for and during the period of their and each of their natural lives and no longer. . . . And I further declare it to be my will that *upon the death of* each of my said daughters and *upon the death* of each of my said grandsons the title to that portion of my lands and stocks in which each has enjoyed a life estate shall *descend and pass absolutely, unconditionally and in fee simple* respectively to the child or children of each lawfully begotten of the body of each or to the child or children lawfully begotten of the body of such child or children. But in *default of child* or children lawfully begotten of the bodies of one or both of my said daughters or of one or both of my said grandsons, the title to that part of my estate of which each or all *have enjoyed* a life estate and for which there is no child or grandchild to inherit shall neither descend nor pass according to any laws regulating descents; but shall remain subject to the following contingences and to be disposed of in manner and form following, to wit: Should either of my said Grandsons die without leaving heirs lawfully begotten of his body, the survivor and his heirs lawfully begotten of his body, shall inherit and possess the portion of the one so dying without such lawful heirs. *But if both my said Grandsons should die without leaving lawful heirs of their or either of their bodies,* then the portion of my estate given to them as a life estate shall pass to and be equally divided between said daughters Mary Ann G. Boggs and Minerva C. Evans, and their heirs

lawfully begotten of their bodies, the same as though no devise had been made to my said grandsons and upon the same conditions of the devise already made to my said daughters, should either of my said daughters *die without leaving heirs lawfully begotten of her body*, her portion of my estate shall pass to and be inherited one-half by my surviving daughter and the heirs lawfully begotten of her body, and the other half by my said grandsons and the heirs lawfully begotten of them or either of their bodies upon the same conditions of the devise already made. But should both of my said daughters die without leaving an heir or heirs lawfully begotten of their or either of their bodies, *then the one equal half of the portion of my estate that was held by her that last died at the period of her death shall pass to and be inherited by my said Grandsons*, Edward O. and Job E. Stevenson or the survivors of them and the heirs lawfully begotten of their or either of their bodies upon the same conditions of the devise already made to them, and the remaining half thereof of the portion of my said daughter that last died shall pass to and be inherited by the children and legal heirs of my deceased brothers Robert Evans and Daniel Evans in fee simple, and to be divided in equal shares between them in compliance with the laws of the State of Ohio and they, the said children and legal heirs aforesaid and each of them shall inherit their several portions of my said estate hereby given, real and personal or mixed for themselves, their heirs and assigns forever. . . . *I* hereby further declare it to be my will and intention *that in the event of a failure of heirs* lawfully begotten of the bodies of my said two daughters and also of my said two grandsons that after the death of my said daughters and of my said two grandsons the part of my estate of which they have respectively had the use of a part, *shall descend to* and be inherited in fee simple by the children and legal heirs of my two

said deceased brothers Robert Evans and Daniel Evans to themselves, their heirs and assigns forever, to be divided in equal shares between them agreeable to the laws of descents in the State of Ohio." (Our italics.)

The testator also directed the executors thereof, whom he named and who duly qualified and acted as executors of said will, to partition said lands among the said devisees, and this was done in December, 1843, the lands set off to Job E. and William O. Stevenson, 1,440 acres, being set off to them in common. Thereafter, but prior to 1857, the said Mary Ann G. Boggs died, and the lands which, by said executors, had been set off to her under the will of John Evans, were, by the judgment and decree of the Tippecanoe Circuit Court, in an action for partition, partitioned and set off to Minerva C. Evans, one-half part, to Job E. Stevenson, one-fourth part for life, and to Edward O. Stevenson, Jr., son of Edward O. Stevenson, one-fourth part in fee simple.

In 1858, Edward O. Stevenson, Jr., commenced a suit in the Tippecanoe Circuit Court, wherein he asked that the lands which had been set off to his father and to Job E. Stevenson by the said executors, and also the lands which had been set off to himself and to Job E. Stevenson in the partition suit of 1857 (the Boggs land), should be partitioned between the said parties, the plaintiff and Job E. Stevenson. Under a decree of said court, one-half of said lands was set apart to said plaintiff in fee simple, and one-half part was set off to Job E. Stevenson "for his sole use and benefit during the term of his natural life."

Minerva C. Evans died in 1875, leaving no child or children surviving her, and, under a decree in a partition suit, there was set off to said Job E. Stevenson, "for and during his natural life," the one-fourth part of the lands lately then owned by said Minerva C. Evans. This decree was framed according to the provisions of the will of

said John Evans, which declared that such lands should be held "upon the same terms and conditions" as the lands directly devised to said party. Job E. Stevenson was in possession of and occupying all of said lands so set off to him, and, in October, 1893, he, his wife, and one Eva C. Stevenson, an only daughter then of full age, executed a deed, in form a deed of warranty, conveying a portion of said lands (920 acres) to one John K. Mc-Millan. Again, and later in the same year, the same parties executed another and similar deed to said Mc-Millan, conveying to him additional lands of those so held by said Job E. Stevenson as aforesaid.

Shortly after the above-mentioned deeds were executed, the wife of Job E. Stevenson died, and he remained a widower until September 22, 1903, when he was married to one Gladys Warnock. After this marriage, he and his said wife lived together until in July, 1922, when Job Stevenson died, leaving surviving him Eva C. Stevenson aforenamed, and then the wife of one George W. Cable, and also three daughters, viz., Matilda May Stevenson, Minerva Colgate Stevenson and Evelynn Stevenson, children born to himself and Gladys Warnock Stevenson, and all of them under legal age.

After the death of Job E. Stevenson, the appellant, Isaac N. Abernathy, was appointed as guardian of Job E. Stevenson's said three minor daughters, and shortly thereafter, as such, commenced suits to recover for said wards a portion of said lands. Six actions were commenced in the Tippecanoe Circuit Court. Five of these—one against Mary E. McCoy and Moraine McCoy, her husband, No. 12,223 on the docket of this court, another against William T. Morin and Jewel Morin, his wife, No. 12,224, another against Fielden E. Morin and Alma Morin, his wife, No. 12,225, another against Martha M. McDill and Mable McDill Andrews, No. 12,226, and the other against the Tippecanoe Land Company, No. 12,227—

were taken by change of venue to Montgomery County. These cases were, for the purpose of trial, consolidated in the Montgomery Circuit Court.

Pending the trial of said causes, said Minerva C. Stevenson, daughter of said Job E. Stevenson, died, and her mother, Gladys R. Davis, former widow of Job E. Stevenson, was then made a party, as being one of the heirs of her said daughter. From an adverse decision in the said court, appeals in said cases have severally been taken to this court, where, as the controlling facts are the same in each and all of said cases, they have been, for the purpose of consideration and decision, consolidated.

Upon the trial of these causes in the circuit court, at the conclusion of the testimony offered on behalf of said appellant, the several appellees, defendants, moved for a finding in their favor upon the issues made by the several complaints and the answers in denial thereto. This motion was sustained, and the court found that the said plaintiffs should take nothing by their said complaint, and it rendered judgment accordingly.

Whether this ruling was based upon a sufficiency of evidence to establish the averments of the complaint or either of said complaints, or was based upon some rule of law, the application of which to the facts in evidence would preclude a recovery by the appellants, the record does not disclose. If for *any* legal reason the appellants were not entitled to a finding and judgment in their favor upon the evidence which they had presented to the trial court, its ruling upon said motion was right, and we now, in passing upon said ruling, must follow a process of exclusion, and consider not only the evidence adduced and its sufficiency to sustain the said action, but we must also examine the rules of law as they apply to and affect real property where the same passes by deed or devise.

It is urged, among other things, that the ruling of the trial court was right, counsel for appellees say, because

these cases present facts which invoke the common-law doctrine of "merger," and we shall first examine to some extent that doctrine. "Merger," as it relates to titles to real estate, has been defined to be "where a greater estate and a less coincide and meet in one and the same person, in one and the same right, without any intermediate estate. The less estate is immediately annihilated, or, in the law phrase, is said to be merged—that is, sunk or drowned—in the greater." 5 Words and Phrases 4492. Counsel in this case are agreed that the law of merger, as the same was understood and applied at common law, obtains in this state, but they are not agreed upon the proposition as to whether or not the facts of the case now under consideration make this case one to which said rule of law should be applied—one which invokes the doctrine of merger. There is no disagreement between counsel as to the proposition that, before there can be a merger, the "remainder" must be a vested one, but they differ, first, as to whether, under the facts of this case, Eva C. Stevenson, in 1893, when she executed the deeds before referred to, was possessed of a vested remainder in and to the lands in question, and have argued this matter at some length. We shall, therefore, first notice this contention.

Mr. Fearne, in his work on remainders, says (pp. 444-446): "Now, the preceding estate may be determined, so as to cause the destruction of a contingent remainder limited thereon, whether at common law or otherwise, in various ways, thus, . . . where the particular estate merges in the inheritance in fee or in tail, either by the act of the particular tenant, or by the descent of the inheritance on the particular tenant subsequently to the taking effect of the particular estate. This merger may be occasioned by the act of the tenant in various ways. . . . If the tenant for life and the immediate remainderman or reversioner join in a convey-

ance." Before there can be such a merger, there must be a *vesting* of the estate in remainder, for, until the estate becomes *vested*, the party has nothing save a mere expectancy which he can convey. The first question which arises, therefore, is: Did Eva C. Stevenson, at the time she signed the deeds heretofore mentioned, have a vested estate or interest in such lands?

It has long been the policy of the law to have a contingent remainder vest at the earliest possible moment. Prior to 13 Edward I, grants were construed without any regard to the will of the grantor as expressed in the grant. Blackstone, speaking of conditional fees (book II, *110), says: "A conditional fee, at the common law, was a fee restrained to some particular heirs, exclusive of others, . . . as the heirs of a man's body, . . . or the heirs male of his body. . . . It was called a conditional fee, by reason of the condition expressed or implied in the donation of it, that if the donee died without such particular heirs, the land should revert to the donor. For this was a condition annexed by law to all grants whatsoever; that, on failure of the heirs specified in the grant, the grant should be at an end, and the land return to its ancient proprietor. . . . Now, with regard to the condition annexed to these fees by the common law, our ancestors held, that such a gift (to a man and the heirs of his body) was a gift upon condition, that it should revert to the donor if the donee had no heirs of his body; but, if he had, it should then remain to the donee. They therefore called it a fee simple, on condition that he had issue. Now we must observe, that, when a condition is performed, it is thenceforth entirely gone; and the thing to which it was before annexed, becomes absolute, and wholly unconditional."

Concerning this construction put upon such grants by the judges of the courts, Blackstone further says, book II, *112: "The inconveniences which attended these lim-

ited and fettered inheritances, were probably what induced the judges to give way to this subtle finesse of construction (for such it undoubtedly was), in order to shorten the duration of these conditional estates."

Shortly after these conditional estates had been declared by the judges to be "fees conditional at common law," and that such conditional fee, upon the birth of a child, such child being within the class designated to take as remainderman, became a fee absolute in the person theretofore holding the particular estate created by such grant, the English Parliament enacted the celebrated *statute de donis*, 13 Edward I, ch. 1 (Stat. at L. [Eng.] 167).

The first section of this celebrated statute recites, in detail, the reason for its enactment, and the second section thereof is as follows: "Wherefore our Lord and King, perceiving how necessary and expedient it should be to provide Remedy in the aforesaid Cases, hath ordained, that the Will of the Giver, according to the form of the Deed of Gift manifestly expressed, shall be from henceforth observed; so that they to whom the land was given under such Condition, shall have no Power to alien the Land so given, but that it shall remain unto the issue of them to whom it was given after their Death, or shall revert unto the Giver, or his Heirs, if Issue fail," etc. Here, we have the express mandate of Parliament to the King's Judges, to the following effect: Hereafter you shall construe all gifts, grants and feoffments according to the *evident* intent of the grantor or settlor. After the enactment of this statute, if the grantor had made his intent *evident*, such intent, if not contrary to positive law, was given full force and effect. After the passage of this act, the questions which the judges were called upon to answer, primarily were two— is the intent evident, and does it violate any positive rule of law. Of course, if the intent was not *evident*, the in-

strument was open to construction, as the said statute did not apply, and the courts, recognizing that free alienation of lands was a material factor having to do with national prosperity, so construed such gifts—conditional fees, contingent remainders—as to have the estate vest at the earliest possible moment, and this rule of construction came to us as a part of our common law. §244 Burns 1926, par. 4. Under this section of our statute, the *statute de donis*, also came to us as a part of our common law, and the rule of construction therein commanded has been recognized by our courts. In *Bruce* v. *Bissell* (1889), 119 Ind. 525, 22 N. E. 4, 12 Am. St. 436, it was said at p. 529: "It is familiar law that, in the absence of a clear manifestation of the intention of the testator to the contrary, estates shall be held to vest at the earliest possible period. The intent to postpone the vesting of the estate must be *clear and manifest,* and must not arise by mere inference or construction." In *Granger* v. *Granger* (1906), 147 Ind. 95, 46 N. E. 80, 36 L. R. A. 186, it was said, at p. 107: "There was a time, as the books show, when a deed from a father to a son for life, remainder to the children of the son, conveyed the absolute title to the son, however improvident such son might be, or however strong might be the desire of the father to save the estate for his grandchildren. We think that the prevailing current of the law now is, particularly as to wills, that where the intention of the donor is *clearly manifest* from the language used, considering the established rules of construction, such intention must prevail; in other words, the owner of property will be permitted to do with it as he thinks best." (Our italics.)

There can be no doubt that, under all the authorities, the remainders created by the will of John Evans, after the particular estate given to his grandson, were contingent remainders, and so the question now arises: Does a reading of the will of said testator make his intent

*evident* as to when such remainders should vest?  If so, that intention must be given effect, if not contrary to positive law.  The Century Dictionary defines "evident" as: "Plainly seen, manifest, obvious, plain, clearly discernible, visible, clear."  It will be noted that the words used in the said statute are "manifestly expressed," and we now come to the consideration of the language of said will, to see if the intention of said testator, as to the time when said remainders should vest, is "manifestly expressed"—is evident.

The rule is elemental that, in seeking the intent of a testator, "the will is read from its four corners," so, in this case, we shall read the entire will.

By the second item of his will, the testator had bequeathed certain bank stock to one Cook, as trustee for his daughter, Minerva C. Stevenson, and gave to said trustee directions as to the management of said trust, payment of dividends on said stock, etc., and he then says: "If any of said stock should remain undisposed of by said Cook at the death of my said daughter, Minerva C. and she should leave any child or children lawfully begotten, then said stock or what shall remain undisposed of by said Cook for the purposes aforesaid shall be absolutely transferred and shall be vested in such child or children of my said daughter Minerva C., at her death. But should my said daughter die without issue, then it is my will that said stock or whatever may remain undisposed of shall be transferred to and be vested in my daughter Mary Ann G., now the wife of John Boggs, Jr., and my two grandsons Edward O., and Job E. Stevenson in the following proportions. . . ."  Again in this same item of his will, in speaking of the personal property therein bequeathed, and how the same should be disposed of by said trustee, he says: "But if my said grandsons, Edward O. and Job E. Stevenson should die before my said daughter Minerva C., and the said Minerva

should leave no issue lawfully begotten, and my said grandsons Edward O. and Job E. Stevenson or either of them should leave issue lawfully begotten, then, said half of said stock that would have been the share of said Edward O. and Job E. Stevenson, *had they been living at time of the death of the said Minerva C.* shall be transferred and vested in the children or child of the said Edward O. or Job E. Stevenson or both of them, as the case may be." (Our italics.) By the tenth item of his will, the testator disposed of "all the rest and residue" of his real estate, and "all the rest and residue of his stock." In this item, he provides for the division of his lands and also of his "stocks" into three equal parts, and then devises and bequeaths unto each of his said two daughters a one-third part thereof, and to the grandsons the remaining one-third part, "for and during the period of their and each of their natural lives and no longer." It is also provided in this item of the will that the executors thereof, therein named, should make partition of said lands and stocks among said devisees and legatees, and the will then declares: "Hereby limiting and restricting the rights of my said grandsons and of my said daughters to the lands and stocks so in manner and form as aforesaid to be set apart to and for them respectively, the uses of which said lands and stocks they and each of them may and shall hold and enjoy as hereinbefore particularly set forth, for and during the period of their and each of their natural lives and no longer." Also, in said item of his will, the testator further says: "And I further declare it to be my will that upon the death of each of my said daughters and upon the death of each of my said grandsons the title to that portion of my lands and stocks in which each *has enjoyed* a life estate, *shall descend and pass* absolutely, unconditionally, and in fee simple respectively to the child or children of each, lawfully begotten of the body of each, or to the child or children

lawfully begotten of the body of such child or children."
(Our italics.)

Again, in the same item of his will, the testator says:
"Should either of my said grandsons die without leaving
heirs lawfully begotten of his body, the survivor and his
heirs, lawfully begotten of his body, shall inherit and
possess the portion of the one so dying without such
lawful heirs." Also, in the same item, it is further pro-
vided: "But if both of my said grandsons should die
without leaving lawful heirs of their or either of their
bodies, then the portion of my estate given to them as a
life estate, *shall pass to* and be equally divided between
my said daughters." (Our italics.) The contingency
of a total failure of heirs of the class designated was also
provided for in the following language: "I hereby fur-
ther declare it to be my will and intention that in the
event of the failure of heirs, lawfully begotten of the
bodies of my said two daughters and also of my said two
grandsons, that *after the death* of my said daughters and
of my said two grandsons the part of my estate which
*they have respectively had the use of a part,* shall descend
to and be inherited in fee simple by the children and legal
heirs of my two deceased brothers Robert Evans and
Daniel Evans," etc. (Our italics.) In Item 13 of said
will, the testator declares his primary object to be "to
secure my estate to those of my own blood."

Did the testator, John Evans, "manifest" his intent—
make such intent evident upon the face of his will? We
think that he did, and that his intent was, that,
as to the children "lawfully begotten" of the
body of each of his two grandsons, the fee of said
lands in which each of said grandsons had a life estate
should not vest until the death of said grandson or
grandsons, and then only in those children lawfully be-
gotten of the body of each who survived the parent.
If this was not the intention of said testator, what did he

mean when he said: "Upon the death of each of my said grandsons the title to that portion of my lands and stocks in which each has enjoyed a life estate shall *descend and pass*," etc.; also, when he said: "But in default of child or children lawfully begotten of the bodies . . . the title to that part of my estate of which each and all *have* enjoyed a life estate"; and when he said: "should both of my said daughters die without leaving an heir or heirs lawfully begotten of their or either of their bodies, then the one equal half of the portion of my estate that *was held* by her that last died at the period of her death shall pass to and be inherited by," etc.; and when the testator further declared: "I hereby further declare it to be my will and intention that in the event of a failure of heirs, lawfully begotten of the bodies of my said two daughters and also of my said two grandsons, that after the death of my said daughters and of my said two grandsons, the part of my estate of which *they have had* respectively the use of a part, *shall descend to* and be inherited by," etc. In each of the above cases, the testator speaks of an estate the use of which had theretofore been enjoyed by the several persons named as devisees of the said particular estate; he uses either the *past tense,* or the past perfect tense, language which is clear and apt to express a vesting which is to be postponed, and to take place at the time of the death of the particular tenant, and, by the use of such language, he "manifestly expressed" his will—made his intention evident.

In the case of *Stevens* v. *Evans, Admx.* (1868), 30 Ind. 39, the court said, at p. 47: "It is true that the law has no partiality for contingent remainders, but in all cases of doubtful construction leans toward vested remainders. But it is equally true that the intention of the testator is always to be the polar star to guide our inquiries. Whenever the meaning can be ascertained, it must govern,

whether it result in contingent or vested remainders."

In the case of *Chapin* v. *Crow* (1893), 147 Ill. 219, 45 N. E. 536, 37 Am. St. 213, it was said: "It will not be necessary, in this case, to discuss at length the doctrine of remainders, however interesting that might be. It should, however, be remarked that the rule is well established that contingent remainders are not favored, and unless, from the language of the instrument, it is manifest that a contrary result was intended, the estate will be regarded as vested, and not contingent. It is, however, equally well settled that effect must be given to the language employed, and if an estate upon contingency is created it must be so declared."

In *Fowler* v. *Duhme* (1896), 143 Ind. 248, 42 N. E. 623, it was said, at p. 258: "That the testator's intention must be our guide in construing the provisions of the will, is not subject to the slightest doubt."

In *Granger* v. *Granger, supra,* the language of the will under consideration was very similar to the language of the will in the instant case, and in that case it was said, at p. 111: "If the estate is for life, with remainder to children *living at the death of the life tenant,* such remainder is contingent. It may never vest, for the life tenant may not leave children living at his death." (Our italics.)

In the case of *Hackleman* v. *Hackleman* (1925), 88 Ind. App. 204, 208, 146 N. E. 590, this court said: "Although the law favors the vesting of estates, and looks with disfavor on the postponement of the vesting of title, nevertheless, contingent remainders are lawful, and if a testator, by unambiguous language, creates a contingent remainder, it is the duty of the court to uphold it."

There is another matter to be considered in connection with the right or estate, if any, held by said Eva C. Stevenson at the time of the execution of said deeds.

It appears from the record herein that, at the time John Evans died and his said will was probated, Job E. Stevenson was less than 10 years old; that there were, at the time of the death of John Evans, and at the time said deeds were executed, children of Robert Evans, and of Daniel Evans, who were deceased brothers of John Evans, *in esse*. It will also be noted that, by the terms of the will of John Evans, these children of Robert Evans and Daniel Evans were to have and take the lands in which Job Stevenson had enjoyed a life estate, in fee simple, in case of a failure of heirs, of the kind designated, to survive the said children and grandchildren of said John Evans.

It will also be noted that by said Item 10 of said will, as to said Job E. Stevenson, after giving to said Job a life estate, the first remainder is in fee simple, to the heirs of his body, lawfully begotten, him surviving, and, in default of such heirs, then in fee simple to the child or children, if any surviving, lawfully begotten of the body of his brother, Edward O. Stevenson. As before said, Job E. Stevenson, at the time of the death of his grandfather, was only nine years old, and of course, at the time the executors made their deed of partition (December 1843), as directed by said will, was unmarried and had no children. In 1857, his brother, Edward O. Stevenson, had died, leaving a son, Edward O. Stevenson, Jr., as his sole heir. This child stood as an heir "presumptive" to his uncle, Job E. Stevenson (at least until such time as a child should be born to the said Job E. Stevenson of the class designated, a child capable of inheriting), and, as such, under the doctrine of the Granger case, *supra*, was, for the time being, the holder of the *fee* of said lands. In the case of *Granger* v. *Granger*, *supra*, the primary devise, in the will there under consideration, was to Edwin Granger, for and during the term of his natural life, with devise over, to the heirs of

his body, if any such there should be him *surviving,* also, with devise over, in case of a failure of such surviving heirs, to therein named persons, in fee. In construing said will, the court said (at pp. 111, 112): "If the estate is for life, with the remainder to children living at the death of the life tenant, such remainder is contingent. It may never vest, for the life tenant may not leave children living at his death. In case of two remainders, or remainder with remainder over, as in the case at bar, the first may be contingent and the second vested. Thus to A for life, remainder to his children surviving, remainder to B. The remainder to A's children is contingent; he may not leave any children surviving. The remainder to B is vested, the enjoyment of possession postponed to the death of A without children surviving."

If, however, it should be held that the said remainder was, at the time said deeds were executed, a vested remainder in Eva C. Stevenson, this fact is not necessarily decisive in this case. The books lay down certain rules, certain limitations upon the person holding such a remainder, under which the execution of a deed by a remainderman and the holder of the particular estate will not invoke the doctrine of merger. Mr. Preston, in his work on Conveyancing and Merger, vol. 3, p. 7, says: "It is always to be remembered that the estate in which the merger takes place *is not enlarged* by the accession of the preceding estate. After the merger, the only subsisting estate continues precisely of the *same quantity and extent of ownership* as it was before the accession of the estate which is merged." (Our italics.) The same author (vol. 3, p. 23) says: "In Sheppard's Touchstone (chapter on Surrender, 299) merger is treated as a surrender in law. So it is in Cheif Baron Comym's Digest; and when the immediate effect of conveyance corresponds to a surrender, the instru-

ment must be pleaded as a surrender, and not in the words in which the intention is expressed. In short, there is not any case in which merger will take place, *unless the right* of making and accepting a surrender resides in the several persons between whom the transaction which causes the determination of one of those estates takes place. This consideration furnishes strong and tenable grounds for an opinion, that the doctrine of merger is founded upon the idea of a surrender in law, corresponding in all material circumstances with a surrender in fact. (Com. Dig. Surr.)" (Our italics.) And, on page 50, the same author, Preston, says: "Following the points of difference suggested by the to be determined cases, and by opinions of acknowledged authority, the conclusion from these cases and opinions as to the law of merger seems to be; . . . ; secondly, the more remote estate must be the next vested estate in remainder or reversion, without any intervening vested estate; and also without any intervening interest by way of contingent remainder, created in the same instant of time, or by the same act which gives origin to the other estates." And continuing, on page 51, he says: "The doctrine will not have effect to alter the quality of one of two estates, in the same person, or to destroy a contingent remainder when several estates are limited, by the same deed or instrument, or take their effect in the same instant of time, and in the same degree, by the same act, and *some other person* is concerned in the consequence of the merger." (Our italics.) Mr. Preston (p. 374) further says: "Nor will the doctrine of merger have effect in those instances in which the several interests are limited by the same deed or instrument, or take effect in the same instant of time, and, in some degree, by the same act; and (for this is an important circumstance), some other person is concerned in the consequences of the merger, and the merger, if it took place, and were

absolute, would either alter the quality of one of two estates in the same person, or destroy a remainder intended for another person." Mr. Fearne, in his work on remainders, vol. 1, p. 339, says: "Now in regard to this rule, we are to observe, that whenever the union or coalition of the particular estate and the inheritance (*except the circumstance of its being created by, or arising under the same instrument or deed as the particular estate*) happens by the conveyance or act of the parties, it seems the intermediate contingent remainders, depending on such particular estate, are destroyed." (Our italics.) In 1 Washburn, Real Property (5th ed.) pp. 205, 206, it is said: "Though the rule is as above stated, there is this exception, if the several interests, namely, the life estate, the contingent remainder, and the remainder or reversion in fee be created or raised *by the same act, deed, or devise,* the law will not, by applying the technical rule of merger, allow the contingent remainder to be destroyed by the life estate and remainder being united in one person. But whenever it vests by the contingency happening, which gives it vitality as an estate, *the life estate and remainder will open* and let it in." (Our italics.) In 6 Greenleaf, "Cruise on Real Property" p. 555, it is said: "Merger is the annihilation by act of law, of the less, in the greater of two vested estates, meeting without any intervening estate, in the same person, in the same right; or if in different rights, meeting in the same person by act of the party, and not by mere act of law, and so that the person in whom the estates thus meet in different rights by act of the party, shall have an absolute power of alienation over both estates." The same author (p. 558) says: "The *first requisite* which must concur in that union of two or more estates from which merger will result, is the following, that the *two estates must meet in the same person,* in the same part of the land, without any intervening vested estate, and without any inter-

vening contingent remainder created by the same instrument by which the other estates are created." See, also, note to *McCreary* v. *Coggeshall* (1904), 74 S. C. 42, 53 S. E. 978, 7 Ann. Cas. 693, in 7 L. R. A. (N. S.) p. 433, where the same rule is announced. The same author (p. 572) says: "Another instance of union without merger is, where the two estates are *limited by the same instrument, to take effect at the same time;* for, in such cases, merger will not take place, so as to destroy an intervening contingent remainder, in which third persons are interested."

Another requisite seems to be that, before the doctrine of merger can be invoked, the estate in remainder must be vested both in quantity and quality. 2 Coke, Littleton p. 338a; Preston, Conveyancing and Merger p. 51. The Supreme Court of Illinois, in the case of *Richardson* v. *VanGundy* (1916), 271 Ill. 476, 111 N. E. 494, had occasion to consider this matter of "quantity" and "quality." In that case, one Laura VanGundy had given an estate for life in certain lands, with remainder over, created by the same instrument, to the heirs of her body. At the time suit was brought, she had *four* living children. One of these children, his wife joining therein, conveyed his interest in said lands to one Whitaker, who thereafter conveyed said interest to Richardson, who brought suit to partition said lands, claiming to be the owner of an undivided one-fourth part thereof. The court, in passing upon the matter, said: "The conveyance from John VanGundy, one of the children, to Whitaker, and from Whitaker to the complainant vested in the complainant an undivided one-fourth of the remainder, subject to the life estate and subject to the contingent event of the birth of another child to the life tenant, *in which event the remainder would open to let in that child for its equal share.* While the estate is vested in quality, it is contingent in *quantity* and must remain uncertain in that

respect until the death of the life tenant. . . . As the number of children may increase until the death of the life tenant, it is now impossible to set aside in severalty to the tenants in common their different quantitative shares. The remainder is vested in so far as it is certain that whenever and however the preceding estate determines there are persons now in being who will surely come into possession of the land, but it is not certain what the number of persons will be, and in that sense the number and size of the shares are contingent," citing Gray, Perpetuities (2d ed.) §110a. In *Deem* v. *Miller* (1922), 303 Ill. 240, 135 N. E. 396, 25 A. L. R. 766, Miller and his children (four adults) had contracted to sell certain lands to Deem, and to convey the same "in fee simple," free and clear of all encumbrances, etc. The Millers acquired all their right and title in and to said lands by virtue of a certain will, under which the father took an estate for life, with remainder over in fee to his children, to be divided at his death. Miller and his children tendered a conveyance to Deem of the title held by them as shown by an abstract, which was refused on the ground that the said deed did not convey the "fee simple," as bargained for. Deem then brought suit for damages for breach of said contract to convey. The contention of Miller and his children was, as stated by the court, "that a deed made by the life tenant and the remainderman in esse, cuts off the right of any after-born children," effected a merger which drowned all such contingent. In passing upon the contention thus made, the court said: "We find no authority for the contention that the rule as to the destruction of contingent remainders should be applied to a case where the estate is vested in quality, but contingent in quantity."

If it be conceded that, at the time said Eva C. Stevenson joined with her father and mother in executing said

aforementioned deeds, she had a vested estate in ▮ said lands as a remainderman, yet, under a well-settled rule, her interest on the birth of another child to her father would open up to let in such after-born child. *Amos* v. *Amos* (1889), 117 Ind. 19, 19 N. E. 539; *McIlhinny* v. *McIlhinny* (1894), 137 Ind. 411, 37 N. E. 147, 24 L. R. A. 489, 45 Am. St. 186; *Alsman* v. *Walters* (1914), 184 Ind. 565, 106 N. E. 879, 111 N. E. 921; *Coquillard* v. *Coquillard* (1916), 62 Ind. App. 426, 113 N. E. 474. Her estate, therefore, at the time she executed said deeds, was one "vested in quality but not in quantity." She held said remainder, not alone in her own right, but also in right of after-born children, if any there should be, of her father Job E. Stevenson. To say that she held the said remainder in fee in *her own right* would be but to say that, if she died prior to the birth of another child to Job E. Stevenson, he, being her sole heir, would take the fee of the estate as his, and, having already the life estate under the will, he would then be the fee-simple owner of said lands, thus cutting off the executory devise as to after-born children of said Job, and thereby, to that extent, nullifying the will of the ancestor, under which he acquired his interest in said lands. Such a result would also be in contravention of the rule, as laid down by Preston, p. 374, that a merger will never be allowed to have any effect in those instances where the several interests are created or limited by the same instrument, and some other person is concerned in the consequence of the merger, which, if it took place and was absolute, would either alter the quality of one of the two estates in the same person, or would destroy a remainder intended for another person. And in *Pells* v. *Brown* (1613), 4 Cro. Jac. 590, 79 Eng. Repr. 504, it was held that no person can destroy an executory interest merely as such, in another person, either by alienation, merger or surrender. This seems, from the authorities,

to be one of the peculiar qualities of an interest under an executory devise of a freehold interest. See Preston, Conveyances and Merger p. 493 *et seq.* When we apply to the facts of this case the various rules affecting and limiting merger, as the same was known to the common law, we are constrained to hold that, in the case at bar, the deeds executed by Job E. Stevenson and Eva C. Stevenson, as remaindermen, did not invoke the doctrine of merger, and that the rights of the after-born children of said Job were not thereby drowned and cut off.

Appellees next contend that, under the rule in Shelley's Case, which rule is conceded by all parties hereto to be a rule of property in this state, Job E. Stevenson under the will of his grandfather, took the fee simple title to the lands in question, and that, therefore, appellant's wards cannot now assert any rights in and to said lands; that, as the ancestor had the fee simple, all his right and title passed by his said deeds to the grantees therein named; and that there was, therefore, nothing for the appellant's wards, children of said Job, to inherit at his death. By the plain provisions of Item 10 of the will of John Evans, Job E. Stevenson was given a life estate in certain lands—this was the particular estate. The remainder was to the *child or children* lawfully begotten of the body of said Job. In *McIlhinny* v. *McIlhinny, supra,* the court (p. 418) said: "That the rule in Shelley's Case has no application is too plain for argument. That the word 'children,' used in the deed has always been held in this court and the courts of England as a word of purchase and not a word of limitation." In *Conover* v. *Cade* (1916), 184 Ind. 604, 112 N. E. 7, the court, after quoting from Wild's Case, 3 Coke §17, said: "The word children is deemed one of purchase rather than limitation, while the reverse is true of the word 'heir,'" and we may say that, as to this construction put upon the word "child" or "children,"

when the same is used as indicating or designating the person or persons who shall take as remaindermen, the authorities are, so far as we have been able to discover, harmonious.

As hereinbefore stated, at the conclusion of the evidence offered in behalf of appellant, the appellees moved for a finding in their favor. This motion was sustained and judgment rendered accordingly, and we now come to a consideration of said motion, its effect, and how the same should be considered. It seems to be well settled by the authorities that such a motion—a motion for a finding and judgment in favor of the moving party—operates, or has the same effect, as a demurrer to the evidence of the adverse party; it has the same effect, and is governed by the same rules, as a motion interposed by a defendant, under the old practice, that the plaintiff suffer a nonsuit. *First Nat. Bank* v. *Northwestern Bank* (1894), 152 Ill. 296, 38 N. E. 739, 26 L. R. A. 289, 43 Am. St. 247. It is tested by the same rules of law as is a request for a peremptory instruction to a jury; it presents to the court for decision the single question whether or not evidence introduced in behalf of the plaintiff, assuming it to be true, and considering as proved all facts which the evidence proves, or by legitimate inference tends to prove, establishes the plaintiff's case as laid. *Reeves* v. *Jackson* (1899), 113 Ga. 182, 38 S. E. 314; *Later* v. *Haywood* (1906), 12 Idaho 78, 85 Pac. 494. The plaintiff is entitled to have drawn all inferences of fact which a jury might draw from the evidence adduced. *Lee* v. *Knapp and Co.* (1897), 137 Mo. 385, 38 S. W. 1107; *McCabe* v. *Montana Central R. Co.* (1904), 30 Mont. 323, 76 Pac. 701; *Whitely* v. *Southern R. Co.* (1898), 122 N. C. 987, 29 S. E. 783. The party, by demurring to the evidence, thereby waives all objection to its admissibility or competency, and, in effect, says that the court shall consider such evidence in passing upon

such demurrer. *Roscoe* v. *Lumber Co.* (1899), 124 N. C. 42, 32 S. E. 389; *Southern R. Co.* v. *Leinart* (1891), 107 Tenn. 635, 64 S. W. 899; *City of Indianapolis* v. *Lawyer* (1871), 38 Ind. 348; *Miller, Trustee,* v. *Porter* (1880), 71 Ind. 521; *Willcuts* v. *Northwestern, etc., Life Ins. Co.* (1882), 81 Ind. 300; *Ohio, etc., R. Co.* v. *Collarn* (1881), 73 Ind. 261, 38 Am. Rep. 134; *Milburn* v. *Phillips* (1894), 136 Ind. 680, 34 N. E. 983, 36 N. E. 360.

The record in this case discloses that the appellant, to sustain the material averments of the several complaints, offered and read in evidence instruments showing title to the lands in question in John Evans; they also put in evidence, by certified copy, the will of John Evans and certified copies of deeds, court proceedings, etc., which were sufficient to show a life estate in Job E. Stevenson in and to the lands involved in this suit; they also offered in evidence proof of the marriage of Job E. Stevenson in 1903, to Gladys Warnock, his death in 1922, and of the children surviving him, fruits of his said last marriage; there was also proof of the guardianship of said children, the death of one of said children, subsequent to the death of the father, and subsequent to the bringing of this suit, and of the heirs it left surviving. As before said, by entering the motion for a finding in their favor, appellees waived all objection to the admissibility or competency of this evidence, and we, therefore, consider it as if it had been admitted without objection. So considering the evidence in this record we have no hesitation in saying that it is amply sufficient to sustain a finding for the appellant.

Appellees in their brief filed herein say: "No question is presented for review as to the ruling of the trial court on appellee's motion for a finding, and that motion is not before the court for any purpose. The ruling of the trial court on said motion of appellees is not assigned as error, and is not made a ground

for a new trial. Appellant's brief presents no question for review as to the ruling on said motion." In *Smith, Admx.,* v. *Cleveland, etc., R. Co.* (1917), 67 Ind. App. 397, 117 N. E. 534, the appellant had assigned in her motion for a new trial the action of the court in sustaining appellee's motion for a peremptory instruction, and, in passing upon the matter, the court said: "This action of the court does not constitute reversible error, since the mere sustaining of such motion worked no injury to appellant, but the substantial and available error, if any, was in instructing the jury to find for appellee," citing *Getchel* v. *Chicago, etc., R. Co.* (1902), 29 Ind. App. 410, 64 N. E. 618.

In *Cook & Bernheimer Co.* v. *Hagedorn* (1921), 82 Ind. App. 444, 131 N. E. 788, the appellant had, at the close of all the evidence, moved the court to instruct the jury to return a verdict in its favor, which motion the court overruled, and this action was assigned as error. In passing upon the matter, this court said: "This action of the court does not constitute reversible error, since the mere overruling of such motion worked no injury to appellant, but the substantial and available error, if any, was in refusing to give such an instruction." So, in this case, it was not the action of the trial court in sustaining said motion for a finding in favor of appellees which worked the harm to appellant's wards, but it was the action of the court, pursuant to such motion or request, in deciding in favor of appellees that did the substantial injury. This action is properly challenged by the specifications in the motion for a new trial herein, namely, that the decision of the court was not sustained by sufficient evidence and that the same was conrary to law.

Cases numbered 12,223, *Abernathy, Gdn.,* v. *McCoy;* 12,224, *Abernathy, Gdn.,* v. *Morin;* 12,225, *Abernathy, Gdn.,* v. *Morin;* 12,226, *Abernathy, Gdn.,* v. *McDill,*

and 12,227, *Abernathy, Gdn.,* v. *Tippecanoe Land Co.,* should be, and the same are, hereby severally reversed with instruction to grant a new trial.