GARRETT *v.* THE ESTATE OF CHRISTIAN HOCTEL, DECEASED.

[No. 18,801. Filed May 15, 1957. Rehearing denied June 25, 1957. Transfer denied November 13, 1957.]

24

*Louis L. Anderson* and *Anderson & Wattles,* of counsel, of South Bend, for appellant.

*Bruce C. Hammerschmidt, Richard D. Bonewitz,* of counsel and *Hammerschmidt & Johnson,* of counsel, all of South Bend, for appellee.

KELLEY, P. J.—Appellant filed a claim for services "performed, furnished and rendered" to her father, the decedent, continuously from April 15, 1945 to March 27, 1953, the date of his death. At the close of appellant's evidence, the court sustained the appellee's "motion for judgment" and entered judgment for appellee. Such action by the court is here assigned as error as is also the overruling by the court of appellant's motion for a new trial.

The available grounds in appellant's motion for a new trial are that the decision of the court is contrary to law; seventeen asserted errors of the court in sustaining appellee's objections to questions put by appellant to certain witnesses; and error in permitting a witness to remain in the court room during the trial after the granting of a motion for separation of witnesses.

There was no error in permitting Inez Morrow, a witness and heir, to "sit in the court room" during the trial. It was a matter within the sound discretion of the court and appellant shows no harm or prejudice resulting to her from the ruling nor that the court abused its discretion. We have carefully reviewed each of seventeen charged errors of the court in sustaining objections to questions put by appellant to cer-

tain of her witnesses and find no error. It would serve no productive purpose to here detail each question, answer and offer to prove. To generalize, we find: one question concerning whether the witness had read the content of letters, without a sufficient and proper foundation being laid for oral testimony with reference thereto; one question was duly answered; one question called for testimony the rejection of which was harmless because other evidence established the same matter inquired about; four questions were too indefinite and general; seven questions were irrelevant to the issues; two questions were bad in form; and in one instance the offer to prove was not consistent with the answer called for by the question.

The court's ruling in material substance, was as follows:

"Considering the evidence most favorable to the claimant on the motion for judgment, the court finds that in view of the presumption which prevails in this case, that is that the service furnished by this claimant is gratuitous. And now the court further finds that such presumption has not been rebutted by clear, positive, and distinct evidence, therefore, the Estate's motion for judgment at the conclusion of the claimant's evidence is sustained."

There is no question in the record as to the rendition by appellant of the services hereinafter referred to. The appellee, in its motion for a finding, stated that "she did render and did perform certain services" and in its brief states that "appellee concedes that services were rendered by appellant to her father and mother while she was living with them during the period of April, 1945, to the death of her father in March, 1953, . . ."; the court, in preliminary discussion of appellee's motion, prior to his ruling thereon, said: "Now we have had a lot of evidence of services. I am satisfied she has rendered the services and is equitably entitled

to something, but we are not faced with equity but with law." Further, the appellant, to obtain evidence as to the reasonable value of the services, propounded a hypothetical question to the witness, Samuel I. Brooks, Manager of the South Bend local office of the Indiana Security Division, wherein the services rendered by appellant were detailed at length. In overruling an objection made to the question by appellee, the court, after appellant deleted from the question the reference to services rendered to one Charley Johnson and that appellant cared for the lawn, said: "I believe that the evidence supports this hypothetical question since he deleted these two matters. . . . I think the question is amply supported by the evidence."

The question presented is whether there was any evidence of a contract by decedent to pay for the services rendered by appellant and that appellant expected compensation for her services.

There is no contention that there was an express contract to pay for the services rendered. Appellant's case rests upon the establishment of an implied contract or promise to pay. The relationship of appellant and decedent, being daughter and father, raised a presumption that the furnished services were gratuitous. Appellant does not contest the validity of such presumption. The question, then, narrows down to the point whether appellant's evidence showed circumstances of "such potency as to overcome the prima facie presumption that the services were rendered gratuitously." Quotes are from *Crampton et al., Administrator* v. *Logan* (1902), 28 Ind. App. 405, 408, 63 N. E. 51.

The record evidence is copious and occupies some 481 pages of the transcript. Such evidence, considering only the evidence favorable to appellant, tends to establish the following facts and circumstances:

In April, 1945, the decedent, Christian Hoctel, then

about 81 years of age, and his wife, Wilda May Hoctel, then about 72 years of age, lived on a farm located about 2¾ miles from Lakeville, Indiana. Their home was an 8 or 9 room colonial type wood frame house, without furnace heat, plumbing, inside toilet facilities, or a bathroom. The toilet was an outside structure located about 75 feet from the home. An old fashioned slop jar was utilized for toilet needs within the home. Water supply was furnished by a cistern outside the house and a pump in a "well in the back kitchen" of the house, access to which required the use of three steps. A woodburning cook stove was used for cooking and the heating of the water.

At said time, and for a time prior thereto, one of decedent's sons, known as Chris Hoctel, Jr., and his wife, resided with decedent and his wife at said farm home, and farmed the land on half shares. The son and his wife built a home of their own and notified the decedent and his wife that they were leaving them, which they did about August, 1945.

Appellant, a daughter of decedent, then of the approximate age of 47 years, came to the home of her parents in April, 1945, for the purpose of assisting and helping them about the household and she remained there until the death of her father in March, 1953. After the son, Chris, Jr., and his family moved from the home, there remained, as members of the household, the decedent, his wife, and the appellant. The latter had been previously employed in private homes as a maid and cook.

The decedent's wife, appellant's mother, in April, 1945 was 72 years of age, about five feet tall, and weighed in the neighborhood of 220 pounds. She was afflicted with diabetes and varicose veins which ruptured at times and for the support of which she wore rubber stockings. It was difficult for her to get around, and for such purpose she used a cane and supported

herself on the table and chairs as she moved about. She performed only minor tasks about the household. This condition continued until her death in January, 1947.

After the death of her mother, appellant continued in the household with her father, the decedent. The latter, in advanced age, was active but was nervous and afflicted with severe infirmities. He became ill with an enlarged prostate gland, with accompanying difficulty of urination, and for which he was given operative procedure on July 10, 1947. This condition caused frequent uncontrolled urination on his personal clothing and the bed, necessitating the use of rubber sheets. In 1949 he suffered from boils about his face, eyes and hands, requiring medical attention and application of epsom salts solution. A cancerous condition of his nose which had eaten into a portion thereof required the application of salve and x-ray treatments. In 1947 or 1948 decedent sustained a broken jaw which required care and the preparation and straining of special food and soups. An injury to his foot from a falling log required him to "soak his leg and foot," and blood poisoning resulting from an injury to his hand necessitated medical attention and tetanous injection. An inoperable cancer of the rectum with an obstruction of the colon occasioned incontinency of decedent's bowel with consequent loss of bowel control and soilage of his clothing and bedding. This condition continued until decedent's death on March 27, 1953.

The appellant during all the eight-year period from April 15, 1945 to the time of the death of her father on March 27, 1953, with the exception of a few days at various times totaling in all approximately one month, or 60 days, was in constant attendance upon her said father, and upon her mother until the latter's demise on January 23, 1947, and acted in the capacity of a practical nurse for them. During all of said period, she had complete charge of all the household affairs and

assumed the responsibilities and performance of the labors of a housekeeper of a farmer's household. She prepared special foods and diets for her said father and mother; purchased most of the foods and groceries, some at her own expense; canned special, sugarless foods, and fruits and vegetables with saccharine for her mother and separate foods for her father; scrubbed the floors, washed the windows and worked in the barn and chicken house; applied medication for the boils and the hemorrhoids and piles suffered by her father, bathed his injured (poisoned) hand, and prepared the water and helped him bathe and "soak" his foot injured by the log; sewed and patched the clothing; cooked the meals for the family and any company; carried in the water for the cooking and washing; churned the butter; cared for the chickens, the cow, and expended some care for the hogs; cleaned and bathed decedent after the mishaps resulting from the bowel disturbance; until the year 1951 she carried in the coal, chopped and split the wood and carried it in; worked in the garden; did some of the painting and hung wall paper; went to the wood lot, a quarter mile from the house, loaded the wood and brought it to the woodshed, unloaded and stacked it; carried the slop jar to the outhouse; took care of and cleaned decedent's soiled clothes and bedding; did the washing each week, including the bed sheets, pillow casings, curtains, mattress covers, blankets, rubber sheets, dresses, overalls, trousers, and other washable articles, and thereafter laundered and ironed them; and made arrangements for the transportation of decedent to and from the physicians' offices.

The evidence, as above delineated, tends, we think, to establish that the work appellant was required to perform was of a difficult nature, distasteful, and confining. There is evidence that after August, 1945, she was practically isolated with her aged and infirm par-

ents, except for occasional visits of her daughter and a few members of the family, and that appellant slept on a couch downstairs because decedent didn't want to be downstairs by himself. There is also evidence that the work physically exhausted appellant and that she worried as to the care of her father, so much so, that it affected her health and necessitated medical attention and her physician advised her to get out of the confinement of the farm home and get some rest.

The evidence discloses that the decedent was satisfied and pleased with appellant's services; and that he complained that his other children never came home to take care of him and that appellant had "stuck by him when the rest of them hadn't," and appellant and her daughter were good to him. In January, 1947, on the day of his wife's funeral, in a conversation at which the witness, Ethel DeLanghe, and the appellant, the decedent, and others were present, the decedent was asked what he "was going to do now" and he said that "he was going to stay there (at the farm home) *if Lodema* (the appellant) *would stay with him*," and at about the same time or shortly thereafter, in a conversation at which the witness, Mrs. Peterson, and Mr. Stewart, appellant, and the decedent were present, Mrs. Peterson said to the decedent: "She (appellant) doesn't look too good" and decedent replied: "No, she doesn't, but *if she will stay with me, she will be well paid for it*." In 1950, the decedent told the witness, Kenneth Shafer, that appellant "would be well taken care of" and, further, that appellant "would be well taken care of when it was over, when he (decedent) was gone." And in 1952, the decedent again told the witness, Kenneth Shafer, that "the only one that stuck by him" was appellant and her daughter and "they would be well taken care of for what they did, for the services they had done."

There was evidence by one witness that the reasonable value of the services rendered by appellant was

"approximately Fifty Dollars a week" and by another witness that "it would be in the neighborhood of Seventy-five, Eighty Dollars a week."

As hereinbefore indicated, the appellee, at the conclusion of the evidence adduced in appellant's behalf, moved for a judgment in its favor. In view of the court's announced finding, in sustaining said motion, it seemingly becomes prudent to consider the effect of said motion and the principles governing its treatment. Primarily, it may be said that it is tested by the same rules of law as is a request for a peremptory instruction to the jury. *Abernathy* v. *McCoy et al.* (1926), 91 Ind. App. 574, 600, Points 16-18, 154 N. E. 682. In *Hill et al.* v. *Rogers et al.* (1951), 121 Ind. App. 708, 712 (Transfer denied), 99 N. E. 2d 270, it is said that in ruling upon a motion for judgment at the conclusion of plaintiff's case, the court:

> "may consider only the evidence and reasonable inferences which may be drawn therefrom, most favorable to the plaintiff.. If there is any evidence from which it may be reasonably inferred the plaintiff was entitled to relief, it is error to sustain such motion."

Further, we may state, in determining upon such motion, that the court must not weigh the evidence and it must exclude all conflicting evidence that is favorable to the defendant. *National Union Fire Insurance Company* v. *Minas Furniture Company* (1927), 86 Ind. App. 358, 362, 158 N. E. 248.

The trial court, in sustaining appellee's motion for judgment, found a prevailing presumption that appellant's services were gratuitous and that such presumption had not been rebutted by *"clear, positive and distinct"* evidence. Appellee, in advocating the correctness of the court's conclusion, contends heavily that in this case there is a "strong presumption against an implied contract to pay and to receive compensation" and the

ordinary rules applicable to rulings on motions for judgment and for a directed verdict "should, therefore, further provide that there must also be clear, distinct and positive evidence to rebut such presumption." Appellee contends further that "if such type of evidence (clear, distinct and positive) is not apparent, then the appellant-plaintiff has not made a prima facie case or rebutted the presumption and *the question is not for the jury, but is a matter of law for the court's determination.*" In so saying, appellee, in effect, asserts that the prevailing presumption of gratuity of services rendered, where there is no express contract to pay, can be rebutted or overcome only by evidence of a stronger "degree" than is required where the claim is that of a stranger, and that in passing upon a motion for judgment or a motion for a directed verdict the court, in the presence of such presumption, is not confined to the rule of "any" evidence or "some" evidence or "slight" evidence but may demand that such evidence be clear, positive, and distinct. In support of these contentions, appellee relies upon the cases of *Hill* v. *Hill* (1889), 121 Ind. 255, 23 N. E. 87 and *Crampton* v. *Logan* (1902), 28 Ind. App. 405, 63 N. E. 51.

We have carefully considered each of said authorities and we find nothing therein that tends to support the said proposals advanced. Neither of said cases arose on a directed verdict or motion for judgment at the conclusion of plaintiff's evidence, and neither employed language which would logically give rise to appellee's conclusion. In dwelling upon the precise phase of the instant case now before us, it is well to maintain the mental observation that appellant's evidence does not disclose that the decedent furnished her with any board, lodging, clothes or other favors in reciprocation for her services. It may be inferred, of course, that since she was required to remain in decedent's farm house night

and day in order to look after her ailing parents, she did have free lodging for such purpose and, under the same circumstances and for the same reasons, it may be inferred that she ate at the table of her parents and thereat consumed food, some of which was furnished by decedent, some she raised in the garden and some she paid for herself or obtained through her daughter and the latter's husband. We mention this at this location because, in considering appellee's contentions, we are faced with its assertion that the presumption here obtaining is "strong." Appellee no doubt obtains this concept from cases in which our courts have held that "the presumption may be strong or weak owing to the degree of relation and intimacy between the parties *and the manner of living and mutuality of the kindnesses and benefits rendered and furnished by one to the other."* (Our emphasis.) *Hill* v. *Hill, supra.* The facts made evident by appellant's evidence do not impel one quickly to the conclusion that the "manner of living" and "mutuality of kindnesses and benefits" existing between appellant and decedent, as exposed by the evidence, were of such character and nature as to produce a "strong" presumption, other than it may be said to be referrable to the common appellation. It seems an ideal structure from which to proclaim again that a slip on the premise may lead to a sprawl on the conclusion.

In *Wainwright Trust Co., Administrator* v. *Kinder* (1918), 69 Ind. App. 88, 120 N. E. 419, the court took the time to rather carefully consider a situation where, as here, the opposing parties were not at radical variance as to the general principles involved but met in opposition as to their application to the facts of the case. It is well to now consider, in brevity, the court's pronouncements there made. There, as here, both parties placed reliance upon the *Crampton* v. *Logan* case, *supra.* The court quoted a portion

of that decision and gave approbation thereto, as we do here. To the end of confined lucidity, we quote pithily:

"The better reason, and the decided weight of authority in this state, is in harmony with the law, as above stated (from the Crampton v. Logan case), though there are decisions in this state which are not in entire harmony with the doctrine as above announced, and *which place some restrictions on the application of the doctrine of implied contracts* . . . Such cases emphasize the idea that there can be no implied contract unless the evidence *clearly shows* an intention on the part of the one for whom the services were rendered to pay for the same, and the claimant rendered the services in expectation of payment, rather than from any other or higher motive growing out of the relation of the parties, and, furthermore, that such intention shall appear *by something said by the one for whom the services were rendered, to the party rendering the same,* or that it must *affirmatively appear* that such statements *were communicated to and acted upon by the one rendering the services,* in expectation of compensation. There can be no doubt that such a showing would be sufficient to warrant the finding of an implied obligation to pay, but, under the law as generally announced by text-writers and the great majority of decisions, such obligation may properly be inferred from facts, circumstances and the relation of the parties, *that do not meet all the requirements of such restricted rule.* The intention to pay and the expectation of compensation *may be inferred from conduct where equity and justice require compensation,* as well as from direct communications between the parties, or communications through other persons representing them. The cases which restrict the rule, as above indicated, *seem to overlook or ignore the very obvious fact that expectation of compensation may coexist with higher motives prompted by affection or the sense of duty, and that the existence of the latter, does not necessarily exclude the idea of pecuniary compensation.* . . .

The right or justice of the claim for compensation, or the wrong and injustice, if any, attending such claim, may be considered, but only as tending to aid in ascertaining the intention and expectation

of the parties in relation to the question of compensation for the services in controversy. . . . *'No precise rule can be stated as to what circumstances will raise an implied contract to pay for services rendered by an adult person for his parent.'* " (Our emphasis.)

In *Allen, Executor* v. *Etter* (1931), 92 Ind. App. 297, 175 N. E. 286, the trial court had refused a requested instruction to the jury that "courts look with disfavor and suspicion upon claims . . . for personal services by one who has been a member of decedent's family; and, as a matter of law, *such claims require a stronger degree* of proof to sustain them than in the case of ordinary claims by strangers." (Our emphasis.) This instruction was disapproved with the statement that the court had failed to find "a single case supporting the theory advanced in this instruction." The court cited the above mentioned Hill case and the Logan case, and then went on to say: "Our courts have gone no further in similar cases to the instant case than to say that there is a presumption that such services are gratuitous, but that this presumption may be rebutted by an express or implied contract to pay for the same, *the existence of which is a question of fact for the jury.*" (Our emphasis.) Appellee opines that this case, the *Allen* v. *Etter* case, is not decisive of the question of "degree of proof" because the instruction was two-fold and the court failed to say which part was bad. The appellate tribunal approved the court's refusal to give said instruction and we are confident that if it had deemed any portion of said instruction to be proper, it would have said so and would have confined its opinion to the improper portion thereof. We have found no Indiana authority, nor have either of the parties herein directed our attention to such authority, which holds either that claims of those in decedent's family or in close relation to him

are looked upon with "disfavor and suspicion" or that such claims require "a stronger degree of proof" to sustain them than do the claims of others.

The appellant in the case of *Neef* v. *Neef's Estate et al.* (1941), 110 Ind. App. 309, 37 N. E. 2d 682, filed claims against the separate estates of her father and mother for services rendered by her. At the close of appellant's evidence, the court granted a motion for a directed verdict. Judge Flanagan very succinctly held such action to be error. No reference was made to any rule such as appellee contends for here. While not mentioned in the opinion, it is logical to assume, in view of the court's disposition of the case, that the presumption of the gratuity of the services rendered prevailed in that case. Nevertheless, the court adhered to the prevailing doctrine in this state that "the question as to whether an express or implied contract to pay exists is for the jury to determine from all the facts and circumstances developed by the evidence, including the situation, conduct and relation of the parties." The appellees in that case urged that the record was silent as to whether the appellant was present when anything was said by the parents to the witnesses as to payment, and, therefore, there was a failure to prove an essential element. The court disposed of that contention by saying that "the fact that the persons rendering the services had such knowledge *may be proved by circumstances as well as by direct evidence*." (Our emphasis.)

Referring again to the evidence as heretofore placed in resume, we find that decedent was satisfied with appellant's services; that at the time of his wife's death he said, in the presence of appellant and others, that he would stay at the farm home "if Lodema (the appellant) would stay with him" and, again, when appellant was present, that "if she (appellant) will stay with me, she will be well paid for

it"; that he told another witness that the appellant would be well taken care of and she "would be well taken care of when it was over, when he (decedent) was gone"; that within the last year of his life, decedent told a witness that "the only one that stuck by him" was appellant and her daughter and "they would be well taken care of for what they did, for the services they had done." There was abundant evidence of the services rendered, the conditions and circumstances under which they were rendered, and the reasonable value of the services. Under the rules which govern the court in its consideration of a motion for judgment, as have been hereinbefore cited, we think the evidence, and the reasonable inferences afforded thereby, were sufficient as against the motion for judgment and that the court erred in sustaining such motion.

Appellee refers to some of the weak phases of the evidence and points to certain items of conflicting evidence. As has been demonstrated, however, neither the trial court nor this court, can, in this case, consider any evidence not favorable to appellant, and, further, such evidence can not now be weighed. The weight of the evidence is for the jury or the court, as the case may be, upon completion of all the evidence submitted upon the issues made.

Judgment reversed with instructions to grant appellant's motion for a new trial and for further proceedings consistent with this opinion.

NOTE.—Reported in 142 N. E. 2d 449.